GREWE v MOUNT CLEMENS GENERAL HOSPITAL

Docket No. 59588. Argued April 11, 1978 (Calendar No. 2).—Decided
    December 28, 1978.

Laverne Grewe brought an action for medical malpractice in the
    treatment of a dislocated shoulder against Mount Clemens
    General Hospital, Michael Fugle, D.O., and others described as
    "agents and servants" of the hospital. A judgment of no cause
    of action in the first trial in Macomb Circuit Court, Walter P.
    Cynar, J., was reversed by the Court of Appeals, Lesinski, C.J.,
    and V. J. Brennan, J. (Levin, J., not participating), and the case
    was remanded for a new trial (Docket No. 11335). The second
    jury returned a verdict of no cause of action against Dr. Fugle
    but awarded the plaintiff $120,000 in damages against the
    hospital. The Court of Appeals, T. M. Burns, P.J., and M. F.
    Cavanagh, J. (Quinn, J., dissenting), affirmed (Docket No.
    27018). The defendant hospital argues on appeal that the
    verdict is inconsistent because the hospital should not have

REFERENCES FOR POINTS IN HEADNOTES

[1-3, 6, 9, 13] 40 Am Jur 2d, Hospital and Asylums §§ 20-22, 26, 28, 38.
    61 Am Jur 2d, Physicians and Surgeons § 186.
    Liability of hospital or sanitorium for negligence of physician or
    surgeon. 69 ALR2d 305.
[3] 3 Am Jur 2d, Agency § 19.
[4] 61 Am Jur 2d, Physicians and Surgeons §§ 110, 131, 198.
    Malpractice: treatment of fractures or disclocations. 54 ALR2d 200.
[5, 6, 11] 31 Am Jur 2d, Expert and Opinion Evidence § 65.
[6, 11] 31 Am Jur 2d, Expert and Opinion Evidence §§ 56, 58, 110.
    61 Am Jur 2d, Physicians and Surgeons §§ 201, 204.
    Modern status of the rules regarding use of hypothetical questions
    in eliciting opinion of expert witness. 56 ALR3d 300.
[7, 8, 12] 22 Am Jur 2d, Damages § 349.
    75 Am Jur 2d, Trial § 578.
[8] 75 Am Jur 2d, Trial §§ 574, 577.
[9, 10] 76 Am Jur 2d, Trial §§ 1161, 1162.
    46 Judgments § 118.
    Inconsistency of criminal verdicts as between two or more defend-
    ants tried together. 22 ALR2d 717.
[10] 75 Am Jur 2d, Trial §§ 885, 886.
[13] 5 Am Jur 2d, Appeal and Error § 897.

vicarious liability where Dr. Fugle was not liable, that an answer to a hypothetical question by an expert witness was not admissible in evidence because it may have been based partially upon an X-ray which was not admitted into evidence, and that the trial court should have instructed the jury *sua sponte* to reduce an award of future damages to its present cash value. In an opinion per curiam, it was *held:*

1. The plaintiff's pleadings were sufficiently broad to include an allegation of the hospital's vicarious liability for the negligent actions of physicians other than Dr. Fugle practicing medicine at the hospital as "agents" of the hospital. Moreover, the plaintiff presented proofs on the relationship that Dr. A. Lewis Katzowitz, an internist who had staff privileges at the hospital, had with the plaintiff, and on his attempt to treat the plaintiff's shoulder at the hospital. Finally, the trial court properly instructed the jury that the defendant hospital was under a duty to provide its patient with competent care and treatment by a person on its staff or in training at the hospital.

2. Generally speaking, a hospital is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to treat his patients. However, if the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment, rather than merely as the place where his physician would treat him, an agency by estoppel can be found. One relevant factor in this determination is whether the hospital provided the plaintiff with the physician or there was a patient-physician relationship independent of the hospital setting. There is nothing in the record of this case which should have put the plaintiff on notice that Dr. Katzowitz, when he attempted to treat the plaintiff's shoulder, was an independent contractor. The plaintiff's testimony shows that he went to the hospital for treatment and expected treatment from the hospital staff. The medical personnel who treated him had no pre-existing relationship with the plaintiff and were ostensibly agents of the hospital. This is not to say that the hospital would escape liability even if the plaintiff knew or should have known of the relationship of Dr. Katzowitz with the hospital.

3. The argument by the hospital that the plaintiff did not introduce testimony as to the standard of care for internists is without merit because the record shows that the standard for treatment of a simple reduction of a dislocated shoulder would be the same for an internist, a specialist, or a general practitioner.

4. The general rule has been that an answer to a hypotheti-

cal question by an expert witness must be stricken when not based upon facts contained in the question or on matters in evidence. The expert witness testified that his answer to a hypothetical question was based on all the information which he had available to him, including hospital records. The hospital contends that the expert had access in those records to an X-ray report which was not in evidence. However, defense counsel failed to establish on cross-examination whether the answer was, in fact, based on the X-ray report which was not in evidence, and there was other expert testimony which reached the same ultimate conclusion as the answer to which the hospital objects. The Court, therefore, declines to reverse the jury's verdict on this ground.

5. The trial judge is under an obligation to instruct the jury that they are to reduce the award of future damages to present worth even in the absence of a request for the instruction. However, under the circumstances of this case, neither a new trial nor a remand for remittitur is appropriate. Counsel for defendant hospital was aware that the instruction in question was given in the first trial but did not request it at the second and did not object when the trial court failed to give it.

Affirmed.

Justice Coleman, dissenting, would reverse the decision of the Court of Appeals and remand to the circuit court for entry of a judgment for the defendant hospital notwithstanding the verdict. The plaintiff's theory of the case was that the hospital was vicariously liable for the alleged malpractice of *Dr. Fugle.* The trial court's instructions clearly and repeatedly said that the hospital could not be found liable unless Dr. Fugle were found to be negligent. The jury was understandably and seriously confused by a last-minute, inconsistent instruction to the effect that they could return a verdict in favor of Dr. Fugle but against the hospital. The argument that the hospital may be found on appeal to be vicariously liable for the acts of *another* doctor who was not named in the complaint or in the plaintiff's theory of the case, but who testified on behalf of the defense, requires a "retrial" of the case in the Supreme Court in order to find the defendant hospital liable. This establishes an unhealthy legal precedent and an unfair rationalization of a case which was tried by the parties on one theory and considered on appeal on another. The defendant hospital had no opportunity to defend the new theory at the trial level, and did not receive a fair trial. There has been no cross-appeal on the issue of Dr. Fugle's lack of negligence. The plaintiff did not object to the instructions that the hospital could be vicariously liable only if

the jury found Dr. Fugle liable. Dr. Fugle was found not negligent. Therefore, the defendant hospital cannot fairly be found negligent.

74 Mich App 479; 253 NW2d 805 (1977) affirmed.

OPINION OF THE COURT

1. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — PRINCIPAL AND AGENT — VICARIOUS LIABILITY.

A verdict in a trial for medical malpractice of no cause of action in favor of a defendant physician but against a defendant hospital is not inconsistent on a theory of vicarious liability where the plaintiff's pleadings were sufficiently broad to include an allegation of the hospital's vicarious liability for the actions of *other* physicians who treated the plaintiff at the hospital as "agents and servants" of the hospital; the plaintiff presented proofs on his relationship with another physician who had staff privileges at the hospital and treated the plaintiff; and the trial court properly instructed the jury that the defendant hospital was under a duty to provide its patient with competent care and treatment by a person on its staff or in training at the hospital.

2. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — VICARIOUS LIABILITY.

A hospital, generally speaking, is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to treat his patients.

3. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — VICARIOUS LIABILITY — PRINCIPAL AND AGENT — ESTOPPEL.

A physician can be found to be the agent by estoppel of a hospital, so as to create vicarious liability in the hospital for the physician's malpractice, where the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment by medical personnel who were ostensibly agents of the hospital, rather than merely as the place where his physician would treat him; one relevant factor in this determination is whether the hospital provided the plaintiff with the physician or there was a patient-physician relationship independent of the hospital setting.

4. PHYSICIANS AND SURGEONS — MALPRACTICE — INTERNISTS — STANDARD OF CARE — DISLOCATED SHOULDER.

Proof of the standard of treatment for a simple reduction of a dislocated shoulder by an internist is not required in a trial for malpractice where the standard of treatment for orthopedic

specialists was proven and there was expert testimony that that standard would be the same for an internist, specialist or general practitioner.

5. WITNESSES — EXPERT WITNESSES — HYPOTHETICAL QUESTIONS — FACTS NOT IN EVIDENCE.

An answer by an expert witness to a hypothetical question based on facts not in evidence is generally required to be stricken from evidence.

6. WITNESSES — EXPERT WITNESSES — HYPOTHETICAL QUESTIONS — FACTS NOT IN EVIDENCE.

The Supreme Court declines to reverse a jury's verdict on the ground that an expert medical witness testified that his answer to a hypothetical question was based on all the information which he had available to him, including hospital records which contained an X-ray report which was not in evidence, where counsel failed to establish on cross-examination whether the answer was, in fact, based on the X-ray report and there was other expert testimony which reached the same conclusion.

7. DAMAGES — INSTRUCTIONS TO JURY — PRESENT WORTH.

A jury must be instructed that they are to reduce an award for future damages to present cash value even in the absence of a request for the instruction (SJI 34.03).

8. DAMAGES — INSTRUCTIONS TO JURY — PRESENT WORTH.

Neither a new trial nor a remand for remittitur is appropriate for failure to instruct the jury *sua sponte* upon retrial of an action for medical malpractice that they must reduce an award of future damages to present worth where counsel for the defendant was aware that the instruction in question was given in the first trial but did not request it at the second trial and did not object when the trial court failed to give it (SJI 34.03).

DISSENTING OPINION BY COLEMAN, J.

9. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — VICARIOUS LIABILITY.

*A verdict in a trial for medical malpractice of no cause of action in favor of the defendant physician but against the defendant hospital is inconsistent where the plaintiff's theory was vicarious liability and a judgment for the defendant hospital notwithstanding the verdict should be entered.*

10. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — VI-
CARIOUS LIABILITY.

*It is clearly erroneous in a trial for medical malpractice against a
physician and against a hospital on a theory of vicarious
liability for the acts of the physician to instruct the jury that
they could return a verdict against the hospital without return-
ing a verdict against the physician through whom it was
contended that the hospital was vicariously liable.*

11. WITNESSES — EXPERT WITNESSES — HYPOTHETICAL QUESTIONS —
FACTS NOT IN EVIDENCE.

*It is erroneous to allow an answer of an expert witness to a
hypothetical question to be based in important part on facts not
in evidence.*

12. DAMAGES — INSTRUCTIONS TO JURY — PRESENT WORTH.

*Failure to instruct the jury sua sponte in an action for medical
malpractice that they must reduce an award of future damages
to present worth is erroneous; however, a judgment for the
plaintiff should not be reversed on this ground alone (SJI
34.03).*

13. APPEAL AND ERROR — THEORY OF CASE — PRINCIPAL AND AGENT
— VICARIOUS LIABILITY.

*It is improper to decide a case on appeal on a theory of vicarious
liability for malpractice of a hospital through the actions of a
physician who appeared as an expert witness but who was not
a defendant in the case where the complaint, the instructions
to the jury requested by the plaintiff, and the proceedings in
the trial court were based on a theory of vicarious liability for
the malpractice of a named defendant physician.*

*Lopatin, Miller, Bindes, Freedman & Bluestone*
(by *Michael Gagleard)* for plaintiff.

*Kitch & Suhrheinrich, P.C.* (by *Richard A. Kitch*
and *Jeremiah J. Kenney)*, for defendant Mount
Clemens General Hospital.

PER CURIAM. This is a medical malpractice case.
At approximately 11 p.m. on March 20, 1967, the
plaintiff received an electrical shock while at
work. This shock allegedly caused the plaintiff to
suffer a dislocated shoulder. After initially visiting

a clinic for treatment, the plaintiff went to the defendant Mt. Clemens General Hospital where he was admitted. He was initially examined by Dr. Gerald Hoffman, an internist, who sought to ascertain whether the plaintiff had suffered any cardiac damage. Dr. Hoffman sought consultation from Dr. Robert O. Fagen, an orthopedic surgeon with staff privileges at the hospital. Dr. Fagen's examination revealed, *inter alia,* that the plaintiff had sustained a dislocated right shoulder.

Dr. Fagen designated Dr. Michael Fugle, an orthopedic resident, to attempt to reduce, at least partially, the dislocation of plaintiff's shoulder. Thereafter, Dr. Fugle made several unsuccessful attempts to do so.

After one of these unsuccessful attempts, Dr. A. Lewis Katzowitz, Dr. Hoffman's associate, who also had staff privileges at the hospital and who, like Dr. Hoffman, was also an internist, observed that the plaintiff was in considerable discomfort and himself attempted to reduce the dislocation by placing his foot on the plaintiff's chest and pulling his arm. He too was unsuccessful in reducing the dislocation. Significantly, Dr. Katzowitz testified that he did not view the X-rays before attempting the reduction.

The plaintiff was to argue at trial that these attempts at reducing his shoulder dislocation resulted in a brachial plexus injury and a fracture of the greater tuberosity. The plaintiff claimed that these injuries were the result of medical malpractice performed on him while he was in the hospital.

In any event, the plaintiff eventually had to undergo surgery for the removal of bone fragments in repair of the biceps tendon and joint capsule.

The plaintiff subsequently filed a lawsuit against the hospital and Dr. Michael Fugle, claiming negligence. Verdicts of no cause of action as to both defendants were returned by a jury which heard the evidence of the case in 1971. The plaintiff pursued an appeal to the Court of Appeals, and that Court reversed and remanded for new trial because the trial court had restricted cross-examination from medical textbooks. 47 Mich App 111; 209 NW2d 309 (1973); *lv den* 390 Mich 811 (1973).

On remand, the plaintiff once again alleged negligence on the part of Dr. Fugle, the hospital, and the hospital's "agents and servants". The case proceeded to trial, and the jury returned a verdict of no cause of action against Dr. Fugle but found for the plaintiff against the hospital in the amount of $120,000 in damages. The hospital moved for new trial or judgment notwithstanding the verdict. The motion was denied.

The hospital pursued an appeal to the Court of Appeals. The Court of Appeals affirmed. 74 Mich App 479; 253 NW2d 805 (1977).

We granted the hospital leave to appeal, limited to three issues: (1) whether the jury's verdict of no cause of action as to Dr. Fugle but in favor of the plaintiff against the hospital was inconsistent; (2) whether the trial court erred in refusing to strike certain testimony given by an expert witness in response to a hypothetical question and in its instructions to the jury with regard to the opinions of experts; and (3) whether the trial court erred in failing to *sua sponte* give the jury an instruction on SJI 34.03—reduction of damages to "present worth".

I

The hospital argues that the jury verdict against it should be set aside because it is internally inconsistent. The hospital contends that the plain-

tiff's complaint, the proofs adduced at trial, and the instructions given to the jury predicated the liability of the hospital solely on the alleged negligence of Dr. Michael Fugle. Since the jury found by virtue of its verdict of no cause of action against Dr. Fugle that he was not negligent, and since the theory of liability against the hospital was based on Fugle's negligence, the verdict in the plaintiff's favor against the hospital cannot stand. In conjunction with this argument, the hospital further contends that even if the plaintiff's theory did encompass a charge of negligence on the part of other physicians practicing medicine at the hospital, there is no showing that the other physician (Dr. Katzowitz) was an agent of the hospital. Finally, the hospital avers that there was no evidence to establish the standard of care with reference to an internist and therefore, if the jury predicated the hospital's liability on the liability of Dr. Katzowitz, the verdict cannot be maintained.

Both the trial court, in its opinion denying the hospital's motion for new trial, and the Court of Appeals were convinced that the plaintiff's pleadings were sufficiently broad to encompass an allegation of derivative liability on the part of the hospital by virtue of the negligent actions of physicians practicing medicine at the hospital in addition to the claimed negligence of Dr. Fugle. We agree. As we have noted, *supra,* the plaintiff's complaint alleged negligence on the part of the hospital's "agents". Moreover, the plaintiff's "theory" at trial was not merely limited to alleged negligence on the part of Dr. Fugle. Counsel for plaintiff extensively cross-examined Dr. Katzowitz both as to his relationship with the plaintiff and his attempt to reduce the dislocation of the plaintiff's shoulder.

The hospital's argument draws some support from the instructions given by the trial judge to the jury. Our review of these instructions does indicate that the plaintiff's primary theory with regard to the derivative liability of the hospital apparently was that Dr. Fugle was negligent and, since Dr. Fugle was an orthopedic resident at the hospital and was paid by the hospital, the hospital should be vicariously liable for the negligent acts of Dr. Fugle. However, the instructions which were given to the jury are not entirely bereft of any articulably distinct basis for finding the hospital vicariously liable. For example, the trial judge instructed the jury:

"[I]f you find that the defendant hospital, as well as their agents, servants and Dr. Fugle did breach the standard of practice of this and similar communities in their reducing of the shoulder, then you are to compute such damage as you feel resulted from the departure of the standard of practice."

And:

"I further charge you, members of the jury, that the hospital was under a duty to a patient to see that he was provided with competent medical care and treatment while he was confined there. If the hospital does not provide him with proper and competent medical care and treatment, the hospital will be liable for the negligence of the person that they so provided who was on their staff or who is a resident in training or internist."

And finally, the trial judge instructed the jury that they could return a verdict in favor of Dr. Fugle but against the hospital. The jury did just that. Thus we find that there is ample record support to conclude that the plaintiff had articulated a theory

of derivative liability independent of the theory which depended on an initial finding of negligence on the part of Dr. Fugle.

The hospital, however, argues that even if such a theory was presented, there is no basis for concluding that Dr. Katzowitz was an agent of the hospital so as to render it vicariously liable for his negligent treatment of the plaintiff. The hospital vigorously contends that Dr. Katzowitz merely had staff privileges at the hospital, and was not in the employ of the hospital; and that therefore no agency relationship can be found to exist. The hospital further asserts that it exercised no control over Dr. Katzowitz' treatment of the plaintiff and should not be held accountable for his actions.

The Court of Appeals, after rejecting the hospital's argument that the jury's verdict was inconsistent, did not deal directly with this aspect of the hospital's argument. The Court merely noted that:

"The plaintiff pleaded and argued that the hospital was liable for the negligence of a person or persons other than Dr. Fugle. Evidence in support of the theory was introduced. The trial court correctly instructed the jury that it could hold the hospital liable for the negligence of a staff member and that they could return a verdict for Dr. Fugle and against the hospital. The jury did exactly that." 74 Mich App 484.

Generally speaking, a hospital is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to render treatment to his patients. See Anno: *Hospital-Liability-Neglect of Doctor,* 69 ALR2d 305, 315-316. However, if the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be af-

forded by physicians working therein, an agency by estoppel can be found. See *Howard v Park,* 37 Mich App 496; 195 NW2d 39 (1972), *lv den* 387 Mich 782 (1972). See also *Schagrin v Wilmington Medical Center, Inc,* 304 A2d 61 (Del Super Ct, 1973).

In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. A relevant factor in this determination involves resolution of the question of whether the hospital provided the plaintiff with Dr. Katzowitz or whether the plaintiff and Dr. Katzowitz had a patient-physician relationship independent of the hospital setting.

In the landmark case of *Bing v Thunig,* 2 NY2d 656; 143 NE2d 3 (1957), the New York Court commented on the changing roles of hospitals in our society as follows:

"The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and interns, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of 'hospital facilities' expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.

"Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to

continue their exemption from the universal rule of *respondeat superior.* The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment."

The Delaware Superior Court in the *Schagrin* case, *supra,* quoted *Bing, supra,* and, while acknowledging that the *Bing* case dealt with medical personnel who were clearly employees of the hospital in question, concluded that the rationale of the New York Court was nonetheless applicable to a situation where medical personnel such as physicians and nurses, though independent contractors, were performing medical services ordinarily performed by the hospital. We agree with this analysis.

The relationship between a given physician and a hospital may well be that of an independent contractor performing services for, but not subject to, the direct control of the hospital. However, that is not of critical importance to the patient who is the ultimate victim of that physician's malpractice. In *Howard v Park, supra,* the Court of Appeals quoted with approval from the opinion in *Stanhope v Los Angeles College of Chiropractic,* 54 Cal App 2d 141; 128 P2d 705 (1942). We too find the California Court's analysis of this area enlightening:

" 'An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.' § 2300, Civ Code. In this connection it is urged by appellant that 'before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, *to*

wit:' (quoting from *Hill v Citizens National Tr & Sav Bank,* 9 Cal 2d 172, 176; 69 P2d 853, 855 [1937]); '[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person relying on the agent's apparent authority must not be guilty of negligence. 1 Cal Jur 739; *Weintraub v Weingart,* 98 Cal App 690; 277 P 752 [1929].'

"An examination of the evidence hereinbefore referred to which was produced on the issue of agency convinces us that respondent has met the requirements enumerated in the *Hill* case. So far as the record reveals appellant did nothing to put respondent on notice that the X-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him are employees of the college or were independent contractors. Agency is always a question of fact for the jury. The evidence produced on this issue is sufficient to support the jury's implied finding that Dr. Joyant was the ostensible agent of appellant college." 54 Cal App 2d 141, 146; 128 P2d 705, 708.

Turning to the facts of the instant case, we see nothing in the record which should have put the plaintiff on notice that Dr. Katzowitz, when he attempted to reduce the plaintiff's shoulder separation, was an independent contractor as opposed to an employee of the hospital.

The plaintiff's testimony convincingly demonstrates that he went to the hospital for treatment and expected to be treated by the hospital:

"*Q.* Mr. Grewe, when you went to the Mt. Clemens General Hospital that evening the 21st, or the morning of the 21st, did you know any doctor there that you were going to ask for treatment?

"*A.* I never knew of a doctor, D.O. doctor, before in my life that I can recall of.

"*Q.* Do you know how Dr. Hoffman happened to see you at the hospital?

"*A.* Well, no. I don't know who he assigned to me. The only thing that I know that somebody had said that the doctor the night before refused to take the case and the next thing I know, Dr. Hoffman was on the scene.

*       *       *

"*Q.* You didn't know Dr. Hoffman before you got there?

"*A.* No, I did not.

"*Q.* Did you know that Dr. Hoffman and Dr. Katzowitz were partners in the specialty of internal medicine?

"*A.* Not at this time, I didn't, no.

"*Q.* Did you subsequently find that out?

"*A.* Yes, I did.

"*Q.* Who provided you with Dr. Fugle, who did these reductions?

"*A.* That, I couldn't answer you.

"*Q.* Did Dr. Fugle tell you, when he came into your room, that he was not an orthopedic specialist?

"*A.* No, he did not.

"*Q.* Did you know that Dr. Fugle, at the time he attempted to reduce the dislocated shoulder, was merely a resident with nine months into training to be an orthopedic surgeon?

"*A.* No, I did not at that time.

"*Q.* What did you know of Dr. Fugle at all?

"*A.* I didn't know nothing of Dr. Fugle."

We are convinced, as the jury must have been, that the plaintiff, when he entered the hospital, was seeking treatment from the hospital itself. There is no record of any preexisting patient-physician relationship with any of the medical personnel who treated the plaintiff at the hospital. In fact, Dr. Hoffman, the internist, did not see the plaintiff until approximately 12 hours after the

plaintiff had been admitted to the hospital. Dr. Hoffman's relationship with the plaintiff comes into clear focus in Dr. Hoffman's testimony:

"*Q.* Do you know how he [plaintiff] happened to be referred to you or placed under your care for examination on this particular day?
"*A.* Yes, sir, I do.
"*Q.* And for what reason, Doctor?
"*A.* Mr. Grewe had presented himself to the emergency room there earlier that day with his particular problem, at which time the emergency room doctor had referred Mr. Grewe to myself for my particular investigation and management."

Dr. Katzowitz also testified:

"*Q.* Doctor, can you tell us as to what occurred during the course of that reduction on March 21, 1967?
"*A.* As I remember, I was told that Dr. Hoffman and I were in care of this patient. I don't recall who told me at the time, but it was years ago, but I was told."

It is abundantly clear on the strength of this record that the plaintiff looked to defendant hospital for his treatment and was treated by medical personnel who were the ostensible agents of defendant hospital. Accordingly, a jury verdict against defendant hospital on this theory is supported by the record. We make no intimation that the hospital would escape liability even if plaintiff knew or should have known the relationship of Dr. Katzowitz with the hospital.

The final allegation of error in conjunction with this issue raised by defendant hospital is that in order for there to have been a basis on which the jury might find liability of the hospital premised on the negligence of Dr. Katzowitz, it would have been necessary that there be introduced at trial

evidence of the standard of care relative to internists rather than individuals trained in orthopedics. It is argued that the standard is not the same and that therefore the jury's verdict cannot be upheld.

The testimony of Dr. Katzowitz himself undermines defendant hospital's position:

"*Q.* Doctor, let's talk about the standard of practice. Are you familiar with the standard of practice, Doctor, in regard to the reducing of dislocated shoulders?

"*A.* I think so.

"*Q.* And Doctor, does the standard of practice, in regard to the reducing of a dislocated shoulder, vary from an internist, such as yourself, and general practitioners or an orthopedic specialist or a resident in orthopedics, or is the standard the same?

"*A.* I would presume that in a simple reduction it would be the same.

"*Q.* And in this case, Doctor, it was felt that you had a simple reduction, is that correct?

"*A.* Yes.

"*Q.* So the standard would be the same whether you were an internist, specialist, general practitioner, right?

"*A.* Yes."

Defendant hospital's position on this point is without merit.

## II

Defendant's next allegation of error is based on the trial court's refusal to instruct the jury to disregard an expert witness's answer to a hypothetical question. The expert witness, Dr. Paul Navarro, admitted on cross-examination that when he had earlier responded to a hypothetical question he took into account facts in addition to those

which were stated in the question. Dr. Navarro indicated that his answer to the hypothetical question was based on all the information which he had available to him in the case, including hospital records. Dr. Navarro's opinion was that the injuries suffered by the plaintiff were the result of the attempted reductions which had been performed without benefit of a general anesthetic. Dr. Navarro testified that this practice did not conform to the appropriate standard. The hospital contends that it was greatly prejudiced by allowing Dr. Navarro's answer to the hypothetical question to stand because part of the hospital records which Dr. Navarro had access to included an X-ray report which was not admitted into evidence. The hospital relies on *Bosch v Damm,* 296 Mich 522; 296 NW 669 (1941).

The plaintiff responds by conceding that generally a hypothetical question posed to an expert witness must be premised on facts already in evidence.[1] However, the plaintiff takes the hospital to task for not developing a record as to exactly what facts not in evidence were relied on by Dr. Navarro in formulating his opinion. Particularly, says the plaintiff, the hospital failed to cross-examine Dr. Navarro concerning the question of whether he relied on the X-ray report which was not admitted. In view of the hospital's failure in

[1] In this vein see the recently adopted Michigan Rules of Evidence, particularly MRE 703 and 705:

"Rule 703. Bases of Opinion Testimony By Experts. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. The court may require that underlying facts or data essential to an opinion or inference be in evidence."

"Rule 705. Disclosure of Facts or Data Underlying Expert Opinion. The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

this regard, the plaintiff contends that the hospital should not be heard to complain on appeal.

The general rule has undoubtedly been that the trial court is required to strike the testimony of an expert witness when the answer to the hypothetical question is based on facts not contained therein, and when the testimony is based on matters not in evidence.[2] See *Bosch, supra,* and *Rivard v Rivard,* 109 Mich 98; 66 NW 681 (1896). However, we are not disposed to reverse on this basis. First, we agree with the plaintiff that it would have been a simple matter for counsel, on cross-examination, to ferret out what facts not contained in the hypothetical question were relied on by the expert in formulating his answer. The hospital's main complaint is that the expert may have relied on an X-ray which was not admissible. Obviously, we have no way of knowing whether he did. Secondly, there was other expert testimony in this case which reached the same ultimate conclusion as that reached by Dr. Navarro. Accordingly, we decline to reverse the jury's finding on this basis.

Since we decline to find reversible error in the trial court's refusal to strike portions of Dr. Navarro's testimony, we are concomitantly disinclined to predicate reversible error on the trial court's refusal to give a defense-requested jury instruction which would have accomplished the same purpose.

III

The hospital contends that the trial court's failure to give Standard Jury Instruction 34.03[3] man-

[2] Allegedly, the X-ray report.

[3] SJI 34.03:

"If you decide plaintiff will sustain damages in the future, you must reduce that amount to its present cash value. The amount of damages

dates reversal and remand for a new trial. The hospital did not request that this instruction be given. However, it is urged that this failure should be excused since counsel for the hospital was of the opinion that this instruction would be given because it was given in the original trial in 1971. Furthermore, the hospital cites the decision of our Court of Appeals in *Freeman v Lanning Corp,* 61 Mich App 527; 233 NW2d 68 (1975). In that case, the Court of Appeals decided that the trial court must instruct the jury to reduce damages to present value whether requested to do so or not.

The plaintiff responds by arguing that absent a specific request that the trial court give SJI 34.03, this Court should not reverse and remand for a new trial. Plaintiff also contends that even if the trial court should have instructed, *sua sponte,* on the question of reduction to present worth, the present pace of inflation is a sufficient countervailing factor to render the error negligible.

This Court has held that the trial judge is under an obligation to instruct the jury that they are to reduce their award of damages to present worth even in the absence of a request for such an instruction. See *Nagi v Detroit United Railway,* 231 Mich 452; 204 NW 126 (1925). However, we are not inclined to reverse and remand for a new trial on this point. Counsel for defendant was aware that the instruction in question was given in the 1971 trial but did not request this instruction at the 1974 trial and did not object when the trial court failed to give it.

On balance, we do not believe that either a new

you determine he will sustain the first year is to be divided by 1.05. The amount of damages you determine he will sustain the second year is to be divided by 1.10. The amount he will sustain in the third year is to be divided by 1.15. You then continue to use a similar procedure for each additional year you determine he will sustain damages. The total of your yearly computations is the present cash value of plaintiff's future damages."

trial or a remand for remittitur is appropriate under the circumstances of this case.

Affirmed. Costs to appellee.

Kavanagh, C.J., and Williams, Levin, Fitzgerald, Ryan, and Blair Moody, Jr., JJ., concurred.

Coleman, J. *(to reverse).* The critical problem with the majority opinion is that we must retry the case in the Supreme Court in order to find Mount Clemens General Hospital liable. It is understandable that the Court wishes to write *"finis"* to a case already seven years in the state courts, after a first appeal by a totally unsuccessful plaintiff, a reversal by the Court of Appeals on a point regarding the use of textbooks, a new trial in which plaintiff was unsuccessful against the defendant doctor but successful against the defendant hospital and subsequent appeals by the hospital to the Court of Appeals and now to this Court.

Although I join in that concern, the means to the end adopted requires the establishment of unhealthy legal precedent and an unfair rationalization of a case tried on one theory and considered on another on appeal. The defendant hospital had no opportunity to defend "our" case at the trial level. The unsuspecting, unsubpoenaed witness whom we have belatedly transformed into the villain of the piece had no warning and so no way to defend his sudden involvement at the appeal level. His reputation is maligned. We cannot know how this will affect his malpractice insurance. All participants in adversary proceedings should be able to find justice.

I would reverse, agreeing with Court of Appeals Judge Quinn writing in dissent.

I

The original complaint named the hospital, Dr. Hugo and Dr. Hoffman as defendants. The first amended complaint substituted the name of Dr. Fugle for Dr. Hugo. The second amended complaint continued the hospital and the same doctors as defendants, claiming that the hospital as principal of and employer of the said doctors was "charged with the consequences of the performance of the said other *defendants*" (emphasis added) within the scope of their duties as agents of the hospital. The legal theories advanced were (1) failure to perform their (defendant's) duties in accordance with the standard of practice of that and similar communities, and (2) breach of contract.

Dr. Hoffman was dismissed from the case by order of the court on February 3, 1971, leaving the hospital and Dr. Fugle as defendants.

The case was straightforward from the complaint through the court's initial instructions to the jury. After the complaint against Dr. Hoffman, an internist, was dismissed, plaintiff's case was pursued and argued on the theory of vicarious liability of the hospital resulting from the negligence of its "agent or servant" Dr. Fugle, an orthopedic resident. The hospital could not be found liable unless Dr. Fugle was found to be negligent.

The judge instructed on this theory, but after all instructions were completed, he was persuaded by plaintiff's counsel to reinstruct as to permissible verdicts. Without offering any further instructions, the jury was told to disregard prior instructions as to permissible verdicts. A different instruction then was given whereby the jury could find *in*

*favor* of the doctor and *against* the hospital. The jury did just that, upon what reasoning we cannot know, for it was inconsistent with prior instructions.

It is my opinion that a fair reading of neither plaintiff's theory of the case—written by plaintiff's own counsel—nor of the other instructions could support such a verdict.

The Court, however, has found a new culprit, a Dr. A. Lewis Katzowitz, who was not a defendant, who was subpoenaed by plaintiff, but (after an interview) was not called upon to testify by plaintiff. He, in fact, came voluntarily to court when asked to testify by defense counsel.

Nowhere in the complaint or plaintiff's theory of the case was his name even mentioned, nor was it mentioned in the instructions to the jury regarding the hospital's liability.

## II

Looking first to plaintiff's theory of the case as presented by plaintiff and related to the jury by the court in its instructions, we must find it to be consistent with the complaints as to negligence. The instruction was:

"According to the plaintiff, the position of the plaintiff is as follows: This is an action for personal injuries arising out of *malpractice and/or negligence of the Mount Clemens General Hospital and Doctor Michael Fugle* who attempted to reduce a dislocated shoulder of the plaintiff on the 21st day of March, 1967, when the plaintiff, Laverne Grewe, was hospitalized and confined to the Mount Clemens General Hospital. It is the plaintiff's claim that the said defendant *hospital,* as well as *Doctor Fugle,* did depart from the standard of practice of this and similar communities and were negligent in

the treatment of the plaintiff in the following particulars: * * *." (Emphasis added.)

The instruction then recapitulated the facts as plaintiff would have them appear and followed that recitation with:

"It is the plaintiff's claim that failure of *Doctor Fugle* to administer the general anesthetic and in attempting to set his shoulder without using a general anesthetic was a departure from the standard of practice." (Emphasis added.)

And

"Further, it is the plaintiff's further claim that since the fracture of the tuberosity, which was not visible upon X-rays before but was visible after the reduction as a result of *Doctor Fugle's* pulling of the arm and raising the arm over the man's head, it caused a fracture of the tuberosity which subsequently had to be removed and is causing disability in the arm and hand today." (Emphasis added.)

(It is underscored that this is only plaintiff's version of facts in support of his theory. Dr. Fugle's testimony was that the initial X-ray was "very, very light" but that it indicated a fracture at the time of admission to the hospital in the same area as appeared on a better X-ray after reduction of the dislocation.)

### III

The majority leans heavily on the following parts of subsequent instructions, taken out of context:

"I further charge you, members of the jury, that if

you find that the defendant hospital, as well as their agents, servants and Doctor Fugle did breach the standard of practice of this and similar communities in their reducing of the shoulder, then you are to compute such damages you feel resulted from the departure of the standard of practice."

However, the next sentence says:

"I further charge you that the hospital is responsible for the acts of its agents and servants, *that being Doctor Fugle,* who is a resident and on their payroll. That the defendant hospital in this case held out Doctor Fugle as a person who is competent as a physician and did provide the plaintiff with Doctor Fugle who they claim was competent as a physician and was a proper person who could reduce the dislocation and was going to reduce the dislocation in accordance with the standard of practice." (Emphasis added.)

The court continued to instruct as to the hospital's duty to provide competent care. In addition to the portion cited above, the per curiam employs the following general statement to net Dr. Katzowitz as the negligent agent or servant:

"If the hospital does not provide him with proper and competent medical care and treatment, the hospital would be liable for the negligence of the person that they so provided who was on their staff or who is a resident in training or internist."

Again, however, that statement does not stand alone. The court proceeded to instruct on the elements of master-servant or employer-employee relationship. The four elements were said to be "the selection and management of the servant or employee, the payment of wages, the power of dismissal and the power of the control of the

servant or employee's conduct". The court then instructed:

"In this matter, the question has been raised that the Mount Clemens General Hospital is vicariously liable for certain alleged acts of negligence on the part of Doctor Fugle. It is, of course, the burden of the plaintiff to establish that the relationship of this doctor to the Mount Clemens General Hospital was one of master and servant, or employer and employee, as I have defined same to you, in order that the hospital would be vicariously liable for his acts.

"I charge you that the hospital is not licensed to practice medicine and that the Mount Clemens General Hospital cannot be held liable in this matter unless you find each of the following facts:

"That *Doctor Fugle,* in treating Laverne Grewe at the Mount Clemens General Hospital was under the control and direction of the hospital in his practice of medicine as it related to Laverne Grewe.

"That *Doctor Fugle,* while under the control or direction of the hospital, violated the standard of practice.

"That the *negligence of Doctor Fugle* was a proximate cause of, or was causally related to, the damages allegedly suffered by the plaintiff.

"This is an action based on the claim of medical malpractice on the part of the defendant, *Doctor Michael Fugle.* In this respect, there are three things which the plaintiff must prove:

"That the acts of *Doctor Fugle* were negligent, as negligence has been defined to you.

"That such negligence was a *proximate cause* of any alleged injury.

"That damages have resulted.

"We are talking about the degree of care. *We are talking about negligence, as applied to Doctor Fugle,* means a failure to exercise that degree of care, skill and knowledge ordinarily exercised by residents in Mount Clemens and similar communities on March 21, 1967. In other words, *Doctor Fugle* is not held to the highest degree of skill, knowledge and ability in render-

ing services, but to what the standard of care was and existed at the time on the date stated to you.

* * *

"The defendants are not responsible in any event for the alleged damages suffered by plaintiff, should they be as a result of any other cause than that related to conduct in violation of the standard of practice among residents and hospitals in Mount Clemens and similar communities, under similar circumstances in the year 1967." (Emphasis added.)

The hospital's liability is firmly attached to alleged negligence of Dr. Fugle and its proximate cause of an alleged injury. The judge clearly says that the hospital cannot be found liable unless Dr. Fugle is found negligent.

## IV

In 41 plus pages of instructions, the four or five vague words upon which the per curiam relies and which are taken standing alone amid extensive, precise instructions cannot, in my opinion, reasonably be interpreted as a basis for our guesswork.

What is clear is that the jury was understandably and seriously confused by the last minute, inconsistent instruction. It could not have been otherwise. After having been told over and over again that it could only find the hospital liable if it found Dr. Fugle liable and then having been told at the very end that it could return a verdict opposite to the instructions, the jury could only have been left to speculate as to what all of it meant. Obviously, we also are speculating.

Defense counsel objected in the trial court both before and after the instruction was given. He said:

"I do not believe that this jury could, in fact, based on

the pleadings and the issues that went forward in this particular case, possibly return a verdict against the hospital without returning it against the agent against [sic] whom it was contended they were vicariously liable."

Nor do I. The challenged instruction was clear error.

It also was error to allow an answer to a hypothetical question to be based in important part upon "facts" not of record. It further was error to fail to instruct the jury that it must reduce the award of future damages to present cash value as set forth in SJI 34.03, but I would not reverse on this error alone.

## V

Most importantly, the entire case against the hospital was based on vicarious liability for Dr. Fugle's alleged negligence. That was the plaintiff's case and that was the case the hospital and Dr. Fugle defended, not the one contained in the per curiam.

It is my opinion that the hospital did not receive a fair trial and that we have failed to right the wrong on appeal.

In final resolution, we find the hospital standing as a lone defendant. There has been no cross-appeal on the issue of Dr. Fugle's lack of negligence. Plaintiff made no objection to the instructions to the jury that the hospital could only be vicariously liable if the jury found Dr. Fugle liable. Dr. Fugle was found not negligent, therefore, the hospital cannot fairly be found negligent.

I would reverse and remand to the circuit court for entry of a judgment notwithstanding the verdict.