*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARY ANNE MARKEL,

       Plaintiff-Appellant,

v

WILLIAM BEAUMONT HOSPITAL,

       Defendant-Appellee,

and

HOSPITAL CONSULTANTS, PC, LINET LONAPPAN, M.D., and IOANA MORARIU,

       Defendants.

UNPUBLISHED
April 22, 2021

No. 350655
Oakland Circuit Court
LC No. 2018-164979-NH

---

Before: BECKERING, P.J., and FORT HOOD and RIORDAN, JJ.

BECKERING, P.J. (*concurring*).

I concur in the result. I write separately to address the issue of ostensible agency. Were this Court not bound by the Michigan Supreme Court's order in *Reeves v Midmichigan Health*, 489 Mich 908; 769 NW2d 468 (Mem) (2011), I would conclude that the Supreme Court's detailed analysis of ostensible agency and its ruling in *Grewe v Mt Clemens Hosp*, 404 Mich 240; 273 NW2d 429 (1978), supports a reversal of the trial court's ruling in the present case. But for *Reeves*, I would hold that plaintiff, Mary Anne Markel, has established a question of fact for the jury with respect to whether defendant Linet Lonappan, M.D. was an ostensible agent of defendant William Beaumont Hospital under the circumstances presented.

In the wake of *Grewe*, our Court's rulings have lacked consistency with respect to ostensible agency, and some have added a greater obligation upon a plaintiff than the Supreme Court arguably intended in *Grewe*. In *Grewe*, after receiving an electric shock that caused him to suffer a dislocated shoulder, the plaintiff went to the defendant hospital, where he was admitted after being seen in the emergency room. *Id*. at 245-246, 255. After his admission, the plaintiff was treated by Dr. Gerald Hoffman, an internist. Dr. Hoffman's associate, Dr. Lewis Katzowitz,

an internist with staff privileges at the defendant hospital, also treated the plaintiff. Dr. Katzowitz unsuccessfully attempted to reduce the plaintiff's shoulder dislocation with efforts including placing his foot on the plaintiff's chest and pulling his arm, without first having viewed x-rays. *Id.* at 246. The plaintiff sued for medical negligence, contending that these attempts at reducing his shoulder dislocation resulted in a brachial plexus injury and a fracture of the greater tuberosity. *Id*. The matter eventually went to a second jury trial in which the jury found the defendant hospital negligent and awarded the plaintiff $120,000 in damages. *Id*. at 247. The defendant hospital argued that it could not be held liable for Dr. Katzowitz's negligence because Dr. Katzowitz was not its employee; he merely had staff privileges, and the hospital asserted that it had no control over his treatment of the plaintiff. *Id*. at 247, 250. The Supreme Court disagreed, concluding that a hospital could be held liable for the negligence of a doctor who was an independent contractor under certain conditions:

> Generally speaking, a hospital is not vicariously liable for the negligence of a physician who is an independent contractor and merely uses the hospital's facilities to render treatment to his patients. See Anno: *Hospital-Liability-Neglect of Doctor*, 69 ALR2d 305, 315-316. However, if the individual looked to the hospital to provide him with medical treatment and there has been a representation by the hospital that medical treatment would be afforded by physicians working therein, an agency by estoppel can be found. See *Howard v Park*, 37 Mich App 496; 195 NW2d 39 (1972), *lv den* 387 Mich 782 (1972). See also *Schagrin v Wilmington Medical Center, Inc*, 304 A2d 61 (Del Super Ct, 1973).

> In our view, the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems. A relevant factor in this determination involves resolution of the question of whether the hospital provided the plaintiff with Dr. Katzowitz or whether the plaintiff and Dr. Katzowitz had a patient-physician relationship independent of the hospital setting. [*Id.* at 250-251.]

The Supreme Court further stated:

> The relationship between a given physician and a hospital may well be that of an independent contractor performing services for, but not subject to, the direct control of the hospital. However, that is not of critical importance to the patient who is the ultimate victim of that physician's malpractice. In *Howard v Park*, *supra*, the Court of Appeals quoted with approval from the opinion in *Stanhope v Los Angeles College of Chiropractic*, 54 Cal App 2d 141; 128 P2d 705 (1942). We too find the California Court's analysis of this area enlightening:

>> " 'An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.' § 2300, Civ Code. In this connection it is urged by appellant that 'before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, *to wit*:' (quoting from *Hill v*

> *Citizens National Tr & Sav Bank*, 9 Cal 2d 172, 176; 69 P2d 853,
> 855 (1937)); (First) The person dealing with the agent must do so
> with belief in the agent's authority and this belief must be a
> reasonable one; (second) such belief must be generated by some act
> or neglect of the principal sought to be charged; [third] and the third
> person relying on the agent's apparent authority must not be guilty
> of negligence. 1 Cal Jur 739; *Weintraub v. Weingart*, 98 Cal App
> 690; 277 P 752 [1929].' " [*Id.* at 252-253.[1]]

The Supreme Court concluded that there was nothing in the record that should have put the plaintiff on notice that Dr. Katzowitz was an independent contractor, as opposed to an employee, of the defendant hospital. *Id.* at 253. It explained that the plaintiff's testimony demonstrated he went to the defendant hospital for treatment and expected to be treated by the hospital. There was no evidence that he had any preexisting patient-physician relationship with any doctor who treated him. *Id.* at 253-254. It also explained that the plaintiff was treated by Dr. Hoffman and Dr. Katzowitz because the emergency room doctor had referred him to Dr. Hoffman. *Id.* at 254-255. The Supreme Court concluded that it was "abundantly clear on the strength of this record that the plaintiff looked to the defendant hospital for his treatment and was treated by medical personnel who were ostensible agents of defendant hospital." *Id.* at 255.

One of the leading cases on ostensible agency from this Court is *Chapa v St Mary's Hosp*, 192 Mich App 29; 480 NW2d 590 (1991). In *Chapa*, after the plaintiff took a fall and was rendered unconscious, he was admitted to the defendant hospital through its emergency room. He was treated by the on-call neurologist. *Id.* at 30-31. The next day, the plaintiff's daughter called Dr. Thepveera, the plaintiff's long-time family doctor, who then took over his treatment. *Id.* at 31. The plaintiff alleged that Dr. Thepveera and Dr. Penput, who treated the plaintiff at Dr. Thepveera's request when he was out of town, were negligent. *Id.* At issue was whether Dr. Thepveera and Dr. Penput were ostensible agents of the defendant hospital. *Id.* The plaintiff argued that, based on *Grewe* and what the Supreme Court stated was the "critical test," the relevant inquiry was whether the plaintiff looked to the defendant hospital for treatment at the time of his admission. *Id.* at 32. This Court rejected the plaintiff's framing of the test. *Id.* It explained:

> It is obvious that *Grewe* so framed the "critical question" because of the facts of
> that case, which differ substantially from those herein. In *Grewe*, the plaintiff, who
> suffered a dislocated shoulder at work, was admitted on an emergency basis and
> immediately was (mis)treated by two hospital physicians, apparently on call, with
> whom he had no prior doctor-patient relationship. It was that treatment that gave
> rise to the cause of action for malpractice. In this case, [the plaintiff] was treated
> by a hospital doctor the day he was admitted. There was a question of fact whether
> [the plaintiff's] family instigated the replacement of defendant's personnel with the

---

[1] In *Stanhope*, the court concluded that the "appellant did nothing to put respondent on notice that the X-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him are employees of the college or were independent contractors." *Stanhope*, 54 Cal App 2d at 146.

family doctor, but it was clear that the family doctor did take over on the day after [the plaintiff's] admission. And it is undisputed that the acts of alleged malpractice began five days after admission. . . .

The essence of *Grewe* is that a hospital may be vicariously liable for the malpractice of actual or apparent agents. Nothing in *Grewe* indicates that a hospital is liable for the malpractice of independent contractors merely because the patient "looked to" the hospital at the time of admission or even was treated briefly by an actual nonnegligent agent of the hospital. Such a holding would not only be illogical, but also would not comport with fundamental agency principles noted in *Grewe* and subsequent cases. Those principles have been distilled into the following three elements that are necessary to establish the creation of an ostensible agency: (1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the agent's authority must not be guilty of negligence. *Grewe*, *supra*, pp 252-253; *Strach v St John Hosp Corp*, 160 Mich App 251, 261; 408 NW2d 441 (1987).

Simply put, defendant, as putative principal, must have done something that would create in [the plaintiff's] mind the *reasonable* belief that Drs. Thepveera and Penput were acting on behalf of defendant. *Grewe, supra* . . . . If, as defendant contended below, [the plaintiff's] family arranged for Dr. Thepveera to replace Dr. Schanz, then the question becomes whether it was reasonable for [the plaintiff] to continue to believe that he was being treated by agents of defendant hospital. The reasonableness of the patient's belief in light of the representations and actions of the hospital is the "key test" embodied in *Grewe*. [*Id.* at 32-34.]

In the present case, William Beaumont Hospital argues that Markel cannot show she had a reasonable belief that defendant Dr. Lonappan was acting on behalf of William Beaumont Hospital, and she cannot show that any such belief was generated by it. It relies on the rule that "[a]gency does not arise merely because one goes to a hospital for medical care. There must be some action or representation by the principal (hospital) to lead the third person (plaintiff) to reasonably believe an agency in fact existed." *VanStelle v Macaskill*, 255 Mich App 1, 11; 662 NW2d 41 (2003) (citation and internal quotation marks omitted).

I would submit that, on the basis of *Grewe*, there is a genuine issue of material fact whether Markel had a reasonable belief that Dr. Lonappan was acting on behalf of William Beaumont Hospital when Markel went to William Beaumont Hospital seeking treatment, William Beaumont Hospital assigned Dr. Lonappan to treat Markel, and Dr. Lonappan assumed Markel's in-hospital care. William Beaumont Hospital has produced no document showing that Markel was advised that Dr. Lonappan was not, in fact, its agent.[2] According to *Grewe*, the critical question is whether

---

[2] Evidence indicated that Dr. Lonappan wore a lab coat with the William Beaumont Hospital insignia, as well as that of Hospital Consultants, P.C., but Dr. Lonappan also testified that she did

Markel, at the time of her presentation to the hospital, was looking to William Beaumont Hospital for treatment of her physical ailments or merely viewed the hospital as the situs where her physician would treat her for her problems, *Grewe*, 404 Mich at 251. In this case, Markel attested to the fact that she was looking to the hospital for her care; she was not viewing it as the situs where her physician would treat her for her problems. And line with *Chapa*, Markel's affidavit makes clear that her expectations did not change while at the hospital; in other words, she made no arrangements to obtain care from her own doctor at any point during her stay. Contrary to the conclusion of my colleagues, I do not deem Markel's statements in her affidavit to contradict her deposition testimony. Simply because she testified at her deposition that she did not remember meeting Dr. Lonappan does not mean should could not have had the reasonable expectation that all medical care providers who were assigned to and attended to her while she was at William Beaumont Hospital were agents of the hospital.[3] Moreover, she did not know Dr. Lonappan prior to her admission to the hospital.

The evidence establishes that Markel went to the William Beaumont Hospital's emergency department because she was experiencing numbness in her feet, back pain, and an inability to urinate a week after an endometrial ablation. Following the results of a blood test, she was admitted to the hospital for additional testing and observation. The hospital provided her with a neurological consult. She was observed by a physician's assistant. She was transferred from the observation unit and admitted to the hospital. The hospital assigned Dr. Lonappan, a board-certified internist and *hospitalist*,[4] to Markel's care. Dr. Lonappan completed a history and performed a physical examination. Dr. Lonappan agreed at her deposition that she was responsible for knowing which studies had been previously ordered for Markel with results pending, she was the doctor responsible for having discharged Markel, and she was the doctor responsible for following up regarding the results of the tests. Importantly, a urine culture showed that Markel was positive for Group B Streptococcus, and Dr. Lonappan did not follow up with Markel. Although Markel did not remember Dr. Lonappan, she did not choose Dr. Lonappan as her doctor. Markel went to the hospital for care and treatment, and the hospital assigned Dr. Lonappan to her care.[5] These facts do not suggest that Markel merely viewed William Beaumont Hospital as the situs where her physician would treat her problems. *Id.* When the benefit of reasonable doubt is

---

not tell patients she was serving as an independent contractor while treating her assigned hospital patients. In any event, Markel does not recall meeting Dr. Lonappan because she was in so much pain.

[3] Neither she nor anyone in her family made arrangements with her doctor to meet Dr. Lonappan or any other doctor at the hospital.

[4] In *Grewe*, the Supreme Court agreed with a New York court's rationale that hospitals should shoulder the responsibilities of respondeat superior, just like every other employer, "where medical personnel such as physicians and nurses, though independent contractors, were performing medical services ordinarily performed by the hospital." *Id*. at 252.

[5] While Dr. Lonappan testified that William Beaumont Hospital assigned her to Markel's hospital care based on a contractual arrangement between her professional corporation and Markel's primary physician for when one of his patients presented to the hospital, there is no dispute that this was not made known to Markel.

given to plaintiff, I would conclude based on *Grewe* that reasonable minds could differ as to whether Dr. Lonappan was an ostensible agent of William Beaumont Hospital. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). See *Setterington v Pontiac Hosp*, 223 Mich App 594, 603; 568 NW2d 93 (1997) (stating that the evidence supported the jury's finding of an agency between the radiologists and the defendant hospital when there was no patient-physician relationship between the plaintiff and the radiologists outside the hospital setting, the radiologists just happened to be on duty when the plaintiff arrived at the defendant hospital, and the defendant hospital held the radiology department out as part of the hospital); *Johnson v Kolachalam*, unpublished per curiam opinion of the Court of Appeals, issued July 21, 2016 (Docket No. 326615), pp 12-13 (stating that given the plaintiff's pain and distress when she arrived at the hospital, she did not unreasonably fail to ask whether the individual doctor who performed her gallbladder surgery was an employee of the hospital or an independent contractor, and she reasonably could have believed that the surgeon was an employee of the hospital); *Crawford v William Beaumont Hosp*, unpublished per curiam opinion of the Court of Appeals, issued October 2, 2012 (Docket No. 298914), pp 7-8 (stating that there were questions of fact whether an ostensible agency existed when the plaintiff went to the emergency room, he was placed under the care of one of the doctors after his diagnosis of atrial fibrillation, and no one broached the topic of the doctors' status as independent contractors with the defendant hospital with the plaintiff).

This Court's decision in *Chapa* does not change my conclusion that there is a genuine issue of material fact whether Dr. Lonappan was an ostensible agent of William Beaumont Hospital. The Supreme Court in *Grewe*, 404 Mich at 251, stated that the "critical question" was whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments. This Court in *Chapa*, 192 Mich App at 32, 34, stated that the Supreme Court framed the "critical question" in this manner because of the facts before the Supreme Court, which were substantially different from the facts before it, and this Court then reframed the critical question for those substantially different facts. But the facts in the present case are not substantially different from those in *Grewe*—in both cases, the plaintiff went to the hospital seeking emergency care and, while at the hospital, received care by a physician with whom there was no preexisting patient-physician relationship. Accordingly, there is no need to reframe the critical question for the present case. Additionally, although the Supreme Court in *Grewe*, 404 Mich at 252, referenced the three factors for ostensible agency, it did not engage in an analysis of each of those factors before determining that the jury's verdict was supported by the evidence. See *id.* at 253-255. Based on *Grewe*, I would conclude that the trial court erred in granting William Beaumont Hospital's motion for summary disposition with respect to the ostensible agency of Dr. Lonappan.

But, as I mentioned at the outset, I am bound by the Supreme Court's order in *Reeves*.[6] In *Reeves*, the Supreme Court reversed this Court's conclusion that a question of fact existed with respect to ostensible agency for reasons set forth in the Court of Appeals' dissenting opinion. *Reeves*, 489 Mich at 908. The dissenting opinion noted that the "[n]either the admission consent form nor the discharge instructions discuss the relationship between defendant and the physicians providing treatment in its emergency room," the doctor who had been assigned to the patient's[7]

---

[6] I believe other Court of Appeals opinions are factually distinguishable.

[7] The patient was plaintiff's husband. He suffered a catastrophic stroke and remained in a "vegetative state" after being discharged from the emergency room at Gratiot Medical Center

case . . . . "never discussed his employment status with [the patient], . . . and there is no evidence in the record that defendant did or failed to do anything that would create a reasonable belief that [the doctor] was acting on its behalf." *Reeves v Midmichigan Health*, unpublished per curiam opinion of the Court of Appeals, issued September 30, 2010 (Docket No. 291855), p 5 (HOEKSTRA, J., dissenting). In other words, silence on the part of the hospital and reasonable assumptions on the part of the plaintiff do not provide the plaintiff with a reasonable question of fact when it comes to ostensible agency, the hospital has to do or fail to do something more than that to create a reasonable belief.[8] Because Markel has failed to produce evidence that William Beaumont Hospital did or failed to do anything that would create a reasonable belief that Dr. Lonappan was acting on its behalf, I must concur that summary disposition was proper here.

I implore our Supreme Court to revisit and clarify the proper legal framework for ostensible agency. Too many patients select and seek care from a hospital based on its highly branded, "premier" reputation, and they rightly expect that they will be in the good hands of the hospital's carefully curated, premier medical employees, only to learn later that they merely entered a brick building filled with independent contractors.[9] And when a mistake is made, they learn that the hospital bears no legal responsibility for care that fails to meet expectations, let alone the bare minimum standard of care.

/s/ Jane M. Beckering

---

where the defendant doctor had treated him. *Reeves v Midmichigan Health*, unpublished per curiam opinion of the Court of Appeals, issued September 30, 2010 (Docket No. 291855), p 1.

[8] Under this framing of the *Grewe* test, not even the plaintiff in *Grewe* would pass the test.

[9] If a hospital chooses to make clear through consent forms that doctors are independent contractors, those forms should be sufficiently clear so that no innocent assumptions remain.