*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COLLEEN LAVALLEY and ROBERT LAVALLEY,

        Plaintiffs-Appellants,

v

ST. MARY MERCY HOSPITAL, also known as TRINITY HEALTH-MICHIGAN, FREEDOM MEDICAL CLINIC, PC, and JAY M. DAITCH, M.D.,

        Defendants-Appellees,

and

MICHIGAN NEURODIAGNOSTICS, PC, and SALEEM TAHIR, M.D.,

        Defendants.

UNPUBLISHED
August 15, 2024

No. 348790
Wayne Circuit Court
LC No. 17-007708-NH

## ON REMAND

Before: GADOLA, P.J., and O'BRIEN and PATEL, JJ.

PER CURIAM.

This appeal returns to this Court on remand from our Supreme Court for reconsideration in light of the Supreme Court's decisions in *Markel v William Beaumont Hosp*, 982 NW2d 151 (Mich, 2022) and *Bowman v St John Hosp & Med Ctr*, 508 Mich 320; 972 NW2d 812 (2021). Plaintiffs appealed by right the trial court's orders (1) granting summary disposition in favor of defendants Freedom Medical Clinic, PC (FMC) and Jay M. Daitch under MCR 2.116(C)(7); (2) granting defendant St. Mary Mercy Hospital's (SMMH) motion challenging plaintiffs' Notice of Intent (NOI); and (3) granting summary disposition in favor of SMMH under MCR 2.116(C)(10)

as to vicarious liability for Dr. Tahir. This Court affirmed the trial court. On remand, we affirm in part and reverse in part.

## I. FACTS

The facts as summarized in this Court's previous opinion are reiterated as follows:

In November 2014, Colleen sought medical care at the SMMH emergency room for complaints related to persistent nausea and vomiting that had lasted six days. During her first visit, she was noted to be "weak and tired," with "continuous nausea and vomiting which is not clearing." Her medical notes also reflected that she had "advanced HER2 positive breast cancer" and had undergone chemotherapy and surgery. The ER consulted Dr. Harmesh Naik, Colleen's oncologist. Colleen was treated with "aggressive hydration, potassium replacement, IV antiemetic," and dextrose. Plaintiffs note that Colleen was not given thiamine (Vitamin B-1) at that time. The next day, Colleen was feeling well enough to go home and was discharged. However, a few days later, on November 21, 2014, Colleen returned to the SMMH emergency room "with continued complaints of nausea, vomiting, hypokalemia, and new complaints of severe muscle weakness, confusion, ataxia, and nystagmus." Her attending physician during this hospitalization was her primary care provider, Dr. Jay Daitch. Colleen was admitted and again given IV dextrose. Colleen's condition continued to deteriorate. She was seen again by Dr. Naik on November 23, and Dr. Naik sought further consultation with Dr. Saleem Tahir, a neurologist. Dr. Tahir suspected that Colleen's symptoms were the "remote effect of malignancy from carcinoma of the breast with cerebellar ataxia nystagmus, truncal and appendicular ataxia." On November 26, 2014, Dr. Daitch ordered a 100-milligram thiamine tablet (Vitamin B-1) to be administered orally, and Colleen was transferred to the University of Michigan for further evaluation and treatment.

At the University of Michigan, Colleen was diagnosed with and treated for Wernicke's Encephalopathy (WE) before being discharged to a rehabilitation facility. Despite her rehabilitation, Colleen continued to experience a moderate degree of ataxia, dysarthria, and discoordination and was unable to return to work as she was largely wheelchair-bound and required assistance for activities of daily living. Plaintiffs assert that "[a]dministration of glucose without thiamine can precipitate or worsen Wernicke Encephalopathy (WE); thus, thiamine should be administered before glucose." Plaintiffs also assert that oral thiamine is unreliable.

In January 2015, Colleen executed a request and authorization for medical records at SMMH, requesting "all records since May 2014" for personal use. In February 2015, her former attorney, Brian Dailey, wrote a letter to Dr. Daitch's office "in relation to an incident / pattern of incidents of medical malpractice that occurred as a result of a negligent treatment of breast cancer between March 2014 and November." The letter opined that Colleen had been given "improper doses of chemotherapy to treat a tumor in her breast," resulting in "months of agonizing nausea, diarrhea, and vomiting resulting in a diagnosis of Wernicke-Korsakoff

syndrome," as well as malnutrition and "severe neurological effects." Thereafter, in March 2015, attorney Dailey's office submitted an authorization for release of information executed by Colleen and specifically requested "admission, consult, lab work and discharge reports only from March 2014 to present." The letter did not mention anything about thiamine.

In May 2016, Colleen discussed the circumstances of her hospitalizations with Dr. Nathaniel Mohney, M.D., during a follow-up visit at the University of Michigan. The clinical notes reflected, in relevant part:

> In the interim since her last visit, we have also discussed extensively circumstances regarding the onset of her symptoms. She brought additional information to our attention regarding her initial hospital course beginning in November 2014. There is notation in the records that she presented initially to St. Mary Emergency Department on November 13, 2014 with severe nausea and vomiting. She had no ataxia or confusion at that time. She was subsequently given D5W at 75 ml an hour for what appears to be 1-liter total. She was monitored overnight and had some improvement in her symptoms and was subsequently discharged home. They report that the patient did not receive thiamine, and there was no notation of thiamine in these notes.
>
> ***
>
> There were concerns that her presentation is consistent with Wernicke's encephalopathy precipitated by thiamine deficiency from her severe nausea and vomiting that preceded her Emergency Department visit. It also appears that the patient did not receive thiamine prior to starting the D5W. The patient has reached out to our department regarding the actual diagnosis and we have consistently reported that her diagnosis is unclear. It is possible with this new information this raises concern for a nonalcoholic Wernicke's encephalopathy, which we initially entertained; however, her later time course with worsening after her discharge in the spring of 2015 would be inconsistent with the Wernicke's encephalopathy and might suggest a superimposed paraneoplastic cerebellar degeneration for which we have been treating and for which her clinical course has improved with immunosuppression (although with limited results). I discussed with the patient, her husband, and her daughter that although I wish I could provide her with a definitive diagnosis in terms of her decline, this may also be multifactorial. We cannot rule out nonalcoholic Wernicke's encephalopathy and we initially treated this transfer. It is very difficult at the present time to fully confirm this as the sole diagnosis, however. The patient is continuing to pursue legal action against the outside hospital.

On October 31, 2016, plaintiffs served a NOI on SMMH, Dr. Saleem Tahir, and Michigan Neurodiagnostics, PC. This NOI summarized the events related to Colleen's hospitalizations. Dr. Daitch was mentioned three times: once in passing; once noting that he was the attending physician when Colleen was re-admitted on November 21, 2014; and once stating, "On 11/26/14, Dr. Daitch FINALLY ordered thiamine be given, but the order was for a 100mg thiamine tablet (Vitamin B-1)." In parentheses, plaintiffs stated that "oral administration of thiamine is an unreliable initial treatment for WE." The NOI set forth in thorough detail the applicable standards of care or practice applicable to SMMH, Dr. Tahir, and Michigan Neurodiagnostics; it also set forth as to the same parties how the standard of care was breached and the actions the three parties should have taken. Among other assertions, the NOI contended that both SMMH and Michigan Neurodiagnostics were negligent in failing to provide Colleen with the proper and necessary medical care and treatment by failing to employ physicians who possessed the necessary skills to provide the care she needed and failing to "adequately supervise, direct, monitor and control its staff members and staff physicians, assistants and residents." Additionally, the NOI indicated that Dr. Tahir breached the standard of care by failing "to order and administer high dose parenteral therapy, especially but not exclusively prior to the administration of Dextrose," failing to properly diagnose nonalcoholic WE, and failing to properly transfer Colleen to the University of Michigan on November 21, 2014.

On December 16, 2016, plaintiffs served a second NOI on SMMH, FMC, Dr. Daitch, Hope Cancer Clinic, PLLC, and Dr. Naik. Most of the "chronology" set forth in the second NOI was identical to the first, other than the omission of some references to Dr. Tahir and the addition of references to Drs. Daitch and Naik. Plaintiffs also described the standard of care required of FMC and Dr. Daitch, added claims against Dr. Daitch and FMC alleging that each breached the standard of care, and also alleged that SMMH was responsible for Dr. Daitch's acts and omissions.

On April 3, 2017, SMMH responded on behalf of itself and its "agents, employees, staff and subsidiaries," stating in part that all parties complied with the standard of care at all times, and denying responsibility for any alleged departures from the applicable standards of practice or care. A second response, once again denying responsibility, was sent on May 19, 2017.

On May 22, 2017, plaintiffs filed a two-count complaint against Dr. Daitch, FMC, Dr. Tahir, Michigan Neurodiagnostics, PC, and SMMH. The first count of the complaint alleged that Colleen presented for care at SMMH and that each of these defendants, who were involved in her treatments while she remained at SMMH, had breached their duty of care to her and were guilty of negligence and malpractice. In relevant part, plaintiffs alleged that Drs. Daitch and Tahir failed to consider or diagnose WE and failed to properly and timely administer thiamine. Plaintiffs posited that these breaches caused Colleen long-term effects that could have been "significantly ameliorated or prevented," and indicated that she continued to suffer from serious disabilities as a consequence. Plaintiffs

indicated that FMC and SMMH were liable for the breaches in care "by way of vicarious liability/ostensible agency." The second count of the complaint sought damages on the same basis for Robert's loss of consortium as a result of Colleen's medical condition.

Defendant SMMH denied each of the specific allegations against Dr. Daitch and Dr. Tahir, and it specifically denied that Dr. Daitch was its agent. Simultaneously, SMMH filed a motion challenging the sufficiency of plaintiffs' NOIs. Likewise, FMC and Dr. Daitch denied the allegations of negligence and malpractice by Dr. Daitch. They moved for summary disposition, seeking to dismiss plaintiffs' claim as being time-barred because they were served with the NOI after the two-year limitations period had expired.[1]

The trial court granted the motions after it concluded that plaintiffs' first NOI did not sufficiently set forth claims against Dr. Daitch and did not put SMMH on notice that it was liable for Dr. Daitch's actions. The court further concluded that plaintiffs' second NOI was untimely under the medical malpractice limitations period. It further concluded that the February 2015 letter to Dr. Daitch precluded plaintiffs from relying on the six-month alternative limitations period under the discovery rule; and in any event, plaintiffs had not shown that they could not have discovered their claims against Dr. Daitch and FMC within the two-year limitations period. The trial court dismissed with prejudice all claims involving Dr. Daitch, including those claims against FMC and SMMH that were premised on Dr. Daitch's actions.

SMMH filed an additional motion for summary disposition asserting that it was not vicariously liable for the actions of Dr. Tahir, because he was an independent contractor and not an ostensible agent or employee of the hospital. SMMH argued that it could not be held liable under an ostensible agency theory because Dr. Tahir rendered Colleen care at the request of her personal physicians. Plaintiffs argued that Dr. Tahir had testified during his deposition that he was an employee of SMMH, and Robert testified that he "was under the impression that the Hospital sent Dr. Tahir to see his wife." Plaintiffs also noted that consent was given to the hospital for Colleen's treatment, which supported their belief that Dr. Tahir was one of the hospital's employees and agents. Plaintiffs posited that there was sufficient evidence to create a genuine issue of fact regarding the existence of an ostensible agency relationship between SMMH and Dr. Tahir. However, the trial court granted SMMH's motion for summary disposition on the ground that Colleen's personal physician sought the consultation with Dr. Tahir, so SMMH could not be held liable for Dr. Tahir's conduct.

---

[1] There appears to be no real dispute that, absent any tolling or relating-back, the applicable limitations period expired by the end of November 2016. Thus, the first NOI fell within the limitations period, and the second NOI did not.

Plaintiffs now appeal by right from the trial court's order dismissing plaintiffs' claims against Dr. Daitch and FMC as untimely, and the orders dismissing plaintiffs' claims against SMMH for the actions of Dr. Daitch and Dr. Tahir. Dr. Tahir and Michigan Neurodiagnostics settled with plaintiffs and are no longer parties to this matter. [*LaValley v St Mary Mercy Hospital*, unpublished per curiam opinion of the Court of Appeals, issued December 22, 2020 (Docket No. 348790), p 1-4).]

This Court affirmed the trial court's orders in an unpublished opinion. *Id*. Thereafter, the Supreme Court issued its opinions in *Markel* and *Bowman*. The Supreme Court subsequently issued an order vacating parts III, V, and VI of this Court's opinion, and remanding the case back to the Court of Appeals for reconsideration in light of *Markel* and *Bowman*.[2]

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). A motion brought pursuant to MCR 2.116(C)(7) tests whether a claim is barred because of "immunity granted by law." MCR 2.116(C)(7). "Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed facts establish that the plaintiff's claim is barred under the applicable statute of limitations." *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). In analyzing a motion for summary disposition under MCR 2.116(C)(7), the trial court must accept as true the contents of the complaint unless contradicted by affidavits, depositions, admissions, or other documentary evidence submitted to the trial court by the movant. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "The substance or content of the supporting proofs must be admissible in evidence." *Id*. Further, while the decision whether to dismiss a case with prejudice is generally within the trial court's discretion, the question whether summary disposition under MCR 2.116(C)(7) should be with prejudice is a question of law, which this Court reviews de novo. *Rinke v Auto Moulding Co*, 226 Mich App 432, 439; 573 NW2d 344 (1997).

Additionally, summary disposition under MCR 2.116(C)(10) is proper when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "Because a motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, the circuit court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012) (citation omitted).

## III. DISCOVERY RULE LIMITATIONS PERIOD

Plaintiffs argue that the trial court erred in granting Dr. Daitch and FMC summary disposition of plaintiffs' claims because the NOI naming Dr. Daitch was timely filed within six months of discovering the claim. Plaintiffs argue that application of the *Bowman* case requires

---

[2] *LaValley v St Mary Mercy Hospital*, 512 Mich 906 (2023).

this Court to reverse the trial court. We disagree. When this case was before this Court previously, we discussed the relevant Michigan authority and its application in this case as follows:

Before commencing a medical malpractice claim, a plaintiff must provide a NOI that complies with the statutory requirements set forth in MCL 600.2912b(4). Service of a NOI tolls the running of the limitations period for 182 days as to any defendants served. MCL 600.2912b(1); *Trowell v Providence Hosp and Med Ctrs, Inc*, 502 Mich 509, 515; 918 NW2d 645 (2018). Generally, a two-year limitations period applies to malpractice claims. MCL 600.5805(8); MCL 600.5838a(1). Plaintiffs tacitly concede that their first NOI was not served on Dr. Daitch or FMC, so it did not toll any applicable limitations period as to those two parties. Plaintiffs also concede that their second NOI was filed more than two years after the alleged malpractice. However, MCL 600.5838a(2) provides an alternative limitations period of "within 6 months after the plaintiff discovers or should have discovered the existence of the claim." Plaintiffs argue that they did not discover their claims against Dr. Daitch until they received Colleen's medical records in September 2016, so their second NOI was timely under the six-month "discovery" limitations period.

"The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff." MCL 600.5838a(2). Our Supreme Court has clarified that the constructive element of the six-month discovery rule—"should have discovered"—requires an objective inquiry. *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 223; 561 NW2d 843 (1997). A "possible cause of action" standard applies, under which the "period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action." *Id*. at 222. Under the possible-cause-of-action standard, the plaintiff "need not know for certain that he had a claim, or even know of a likely claim . . . " *Id*. However, "[o]nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action." *Id*. (quotation marks and citation omitted). In evaluating whether a plaintiff was aware of a possible cause of action, "courts should consider the totality of information available to the plaintiff, including . . . his physician's explanations of possible causes or diagnoses of his condition." *Id*. at 227. "[T]he inquiry is whether it was *probable* that a reasonable lay person would have discovered the existence of the claim." *Jendrusina v Mishra*, 316 Mich App 621, 626; 829 NW2d 423 (2016) (emphasis in original). Notably, the standard is when a lay plaintiff *should* have discovered the potential claim, not when the lay plaintiff merely *could* have discovered the potential claim. See *id*. at 624.

In this case, plaintiffs should have discovered the possible cause of action against Dr. Daitch and FMC over six months before the December 2016 NOI. Indeed, although plaintiffs argue that the claim against Dr. Daitch was not discovered until nearly two years after Colleen's hospitalization, when her second attorney requested and received her medical records in September 2016, this

argument is unconvincing in light of the totality of the information available to plaintiffs before the expiration of the limitations period. Notably, in January 2015 Colleen executed a release requesting her medical records from SMMH beginning in March 2014. Plaintiffs then hired attorney Dailey in February 2015, and in his letter to Dr. Daitch, he asserted that Colleen suffered from WE syndrome as a result of Dr. Daitch's alleged medical malpractice and as a result of negligent treatment of breast cancer. In March 2015 Dailey's office also requested a copy of Colleen's relevant medical records from SMMH. Accordingly, plaintiffs had reason to know about the contents of Colleen's medical records and the potential claim over a year and a half before the expiration of the limitations period. Indeed, although the letter from attorney Dailey to Dr. Daitch was premised on liability due to "improper dosages of chemotherapy," rather than thiamine therapy, there is no question that plaintiffs had time to conduct additional discovery to investigate the details of this claim. During this discovery, plaintiffs should have discovered the merits of any other theories. Even if plaintiffs did not have complete records, the six-month period begins when a plaintiff becomes aware of a potential claim, not when the plaintiff has accumulated sufficient medical documentation to prove it. See *Jendrusina*, 316 Mich App at 629-631.

In addition, the notes from Colleen's May 2016 visit with Dr. Mohney at the University of Michigan show that by that time, plaintiffs had enough medical records to allow Dr. Mohney to deduce the possibility that Colleen had been improperly administered glucose without thiamine. Although Dr. Mohney's notes show that he could not provide plaintiffs with a definitive diagnosis, the six-month limitations period begins to run when a plaintiff should learn of a *potentially actionable* diagnosis. *Solowy*, 454 Mich at 215-216. Plaintiffs' deposition testimonies indicate that they learned of the possible thiamine connection from Dr. Mohney, consistent with Dr. Mohney's notes. The record does not definitively show on which date the six-month discovery period began running, but the record does clearly show that it began running absolutely no later than May 2016, when plaintiffs met with Dr. Mohney. Consequently, the six-month discovery period had already run by the time plaintiffs served their second NOI in December 2016. The trial court correctly granted summary disposition in favor of Dr. Daitch, FMC, and SMMH as to vicarious liability for Dr. Daitch, on the basis of the expiration of the statute of limitations. [*LaValley*, unpub op at 4-5]

Applying *Bowman*, 508 Mich 320, to this issue does not undermine this Court's previous holding. *Bowman* concerned the application of the six-month discovery limitations period found in MCL 600.5838a(2). See *Bowman*, 508 Mich at 327. At issue was whether the plaintiff should have discovered the existence of her claim more than six months before initiating the suit. *Id*. The Supreme Court reiterated that "discovering 'the existence of the claim' requires knowing a 'possible cause' of an injury." *Id*. The Court noted that the case was in the pleading stage, and held that the record did not reveal whether the plaintiff should have known six months before initiating proceedings that the delay in her cancer diagnosis might have been caused by a misreading of the 2013 mammogram. *Id*. at 327-328.

While the Court in *Bowman* found that the record was not developed enough to conclude the plaintiff should have known of a possible injury, that is not the case here. Here, there is a record of what plaintiffs knew and what actions they took. The record indicates that plaintiffs had knowledge of facts that were sufficient to, and did, arouse suspicion of a potential claim before they met with Dr. Mohney in May 2016. Plaintiffs acted on that suspicion by investigating further and requesting Colleen's medical records more than a year before meeting with Dr. Mohney. Even if plaintiffs did not have complete medical records, the six-month period begins when a plaintiff becomes aware of a potential claim, not when the plaintiff has accumulated sufficient medical documentation to prove it. See *Solowy*, 454 Mich at 215-216; *Jendrusina*, 316 Mich App at 629-631. Thus, it remains this Court's conclusion that "the six-month discovery period began running… absolutely no later than May 2016, when plaintiffs met with Dr. Mohney," which was more than six months before plaintiffs filed and served the second NOI. *LaValley*, unpub op at 7. The trial court properly granted summary disposition in favor of Dr. Daitch, FMC, and SMMH, as to the vicarious liability for Dr. Daitch, pursuant to MCR 2.116(C)(7).

## IV. SUFFICIENCY OF FIRST NOI

Plaintiffs also argue that their first NOI placed SMMH on notice of the claim against it of vicarious liability for Dr. Daitch's alleged negligence. We disagree. Our Supreme Court left undisturbed this Court's ruling in Part IV of our previous opinion regarding the insufficiency of the first NOI, and we adopt that reasoning in its entirety on remand. See *LaValley*, unpub opn at 6.

## V. OSTENSIBLE AGENCY

Plaintiffs also assert that the trial court erred in granting SMMH's motion for summary disposition in regard to plaintiffs' claim of vicarious liability based on Dr. Tahir's alleged negligence because there is a question of fact as to whether an ostensible agency relationship existed. Plaintiff argues that the Supreme Court's decision in *Markel* requires this Court to reverse the trial court. When this case was before this Court previously, we discussed authority on ostensible agency and its application to this case as follows:

> Our Supreme Court has held that a hospital is not liable for the alleged negligence of independent contractors. *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 250; 273 NW2d 429 (1978). Further, this Court has clarified that a hospital is not liable for the malpractice of independent contractors "merely because the patient 'looked to' the hospital at the time of admission or even was treated briefly by an actual nonnegligent agent of the hospital." *Chapa v St Mary's Hosp of Saginaw*, 192 Mich App 29, 33; 480 NW2d 590 (1991). Instead, a hospital can only be held responsible for the conduct of an independent contractor when the plaintiff can establish the creation of an ostensible agency between the medical provider and the hospital as follows:
>
> > (1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the

> agent's authority must not be guilty of negligence. [*Chapa*, 192
> Mich App at 33-34.]

"Simply put, [the hospital], as putative principal, must have done something that would create in [the patient's] mind the reasonable belief that [the doctors] were acting on behalf of defendant." *Id*. at 34. However, "the fact that a doctor used a hospital's facilities to treat a patient is not sufficient to give the patient a reasonable belief that the doctor was an agent of the hospital." *VanStelle v Macaskill*, 255 Mich App 1, 11; 662 NW2d 41 (2003).

> In this case, there is no evidence to support an ostensible agency claim. Notably, plaintiffs presented no evidence that Colleen reasonably believed that Dr. Tahir was an agent of SMMH. Further, although Colleen was admitted to SMMH, during her stay she was relying on her personal internist, Dr. Daitch, and personal oncologist for care and treatment. Indeed, as plaintiffs concede, it was Dr. Naik who requested that Dr. Tahir complete a neurology consultation. Despite the fact that plaintiffs now claim that they were unaware of Dr. Naik's request, they failed to provide any evidence to support a conclusion that the hospital undertook any act that would support a reasonable belief that Dr. Tahir was acting as its agent. Indeed, while plaintiffs attempt to argue that their belief that Dr. Tahir was acting as an agent of the hospital was supported by various consent forms that were signed allowing treatment by the hospital, none of the consent forms represented that Dr. Tahir was an agent of the hospital. Notably, the forms also did not limit the care provided within the hospital to care that could be provided only by the hospital's agents or employees. Instead, the consent forms allowed the hospital to provide either general or specific treatments and outlined the billing practices of the hospital. Accordingly, we decline to conclude that the consent forms support a reasonable belief that Dr. Tahir was acting as the hospital's agent during his consultation. In whole, under these circumstances, plaintiffs failed to establish a genuine issue of fact regarding the existence of an ostensible agency, and the trial court did not err by concluding that SMMH cannot be held vicariously liable for Dr. Tahir's conduct. [*LaValley*, unpub op at 7].

In *Markel*, the Supreme Court reiterated, "to determine if ostensible agency exists, 'the critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems.'" *Markel*, 982 NW2d at 152, quoting *Grewe*, 404 Mich at 251. "A patient who has clear notice of a treating physician's employment status or who has a preexisting relationship with a physician outside of the hospital setting cannot reasonably assume that the same physician is an employee of the hospital merely because treatment is provided within a hospital." *Id*. at 153. But "when a patient presents for treatment at a hospital emergency room and is treated during their hospital stay by a doctor with whom they have no prior relationship, a belief that the doctor is the hospital's agent is reasonable unless the hospital does something to dispel that belief." *Id*.

Our previous opinion relied on *Chapa v St Mary's Hosp of Saginaw*, 192 Mich App 29, 33; 480 NW2d 590 (1991) and *VanStelle v Macaskill*, 255 Mich App 1, 10; 662 NW2d 41 (2003),

-10-

for the proposition that "the putative principal must have done something that would create in the patient's mind the reasonable belief" that an agency relationship exists. See *LaValley*, unpub opn at 9. However, *Markel* states that a "core aspect" of the holding in *Grewe* was that, "[a]n agency is ostensible when the principal intentionally *or by want of ordinary care*, causes a third person to believe another to be its agent who is not really employed by him." *Markel*, 982 NW2d at 153 (emphasis in original), quoting *Grewe*, 404 Mich at 252. Thus, the Supreme Court found that decisions of this Court had misconstrued the rule in *Grewe*: "To the extent that *VanStelle* requires a plaintiff to show some additional, affirmative act by the hospital in every emergency room case to prove ostensible agency, it is in direct tension with *Grewe* and therefore overruled." *Id*.

Here, the question then is not whether SMMH did something that affirmatively suggested to plaintiffs that Dr. Tahir was its agent, but whether SMMH, by want of ordinary care, failed to dispel that reasonable belief. *Id*. The record shows that Colleen had no preexisting relationship with Dr. Tahir before her hospital stay. She did have a preexisting relationship with her oncologist, Dr. Naik, who requested the involvement of Dr. Tahir. But Robert testified that he "was under the impression that the hospital sent Dr. Tahir" to see his wife. Further, in their response to SMMH's motion, plaintiffs argued that the consent forms presented to Colleen at the hospital "were all for the purpose of allowing treatment from St. Mary's" not a specific doctor. *Markel*'s reiteration that a hospital can establish ostensible agency with an independent contractor by omissions as well as actions, necessitates a remand in this case.

To survive a motion for summary disposition under MCR 2.116(C)(10), plaintiffs were required to present sufficient evidence from which a reasonable jury could conclude that Colleen believed that Dr. Tahir was an agent of SMMH. Plaintiffs argue that Colleen does not recall her time in the hospital due to her illness. But where a patient is unable to testify as to the elements of ostensible agency, the court is to consider the other evidence. See *Setterington v Pontiac General Hosp*, 223 Mich App 594, 602-603; 568 NW2d 93 (1997) (where the plaintiff was deceased, other facts in evidence supported jury's finding of ostensible agency). Plaintiffs presented the following evidence to rebut SMMH's motion for summary disposition: (1) Robert's deposition testimony that he believed the hospital sent Dr. Tahir to treat Colleen, and (2) the consent forms plaintiffs filled out at the hospital referenced only treatment by the hospital. Viewing this evidence in the light most favorable to plaintiffs, and considering that Colleen did not have a preexisting relationship with Dr. Tahir, there is a question fact as to whether Colleen was looking to the hospital or Dr. Tahir for treatment. Thus, we reverse the trial court's order granting summary disposition in favor of SMMH with respect to the claims involving Dr. Tahir.

## VI. DISMISSAL WITH OR WITHOUT PREJUDICE

Lastly, plaintiffs argue that summary disposition should have been granted without prejudice, rather than with prejudice. We disagree. Our Supreme Court left undisturbed this Court's ruling in Part IV of our previous opinion regarding the insufficiency of the first NOI, and we adopt that reasoning in its entirety on remand. See *LaValley*, unpub opn at 7. "Thus, to the extent we affirm the trial court's grants of summary disposition, we also affirm the trial court's dismissal with prejudice." *Id*.

-11-

## VII. CONCLUSION

We affirm the dismissal with prejudice of all claims involving Dr. Daitch because plaintiffs' second NOI was untimely. We reverse the trial court's order granting SMMH's motion for summary disposition of plaintiff's vicarious liability claim involving Dr. Tahir because there remains a question of fact as to whether an ostensible agency relationship existed.

/s/ Michael F. Gadola
/s/ Colleen A. O'Brien
/s/ Sima G. Patel