*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOHNATHAN MYERS,

     Plaintiff-Appellee,

v

BOARD OF HOSPITAL MANAGERS FOR THE CITY OF FLINT, doing business as HURLEY MEDICAL CENTER, and ERICH A. RIEHL, P.A.,

     Defendants-Appellees,

and

LASZLO HOESEL, M.D., and METRO ACUTE SURGICAL, PLC,

     Defendants-Appellants,

and

ALLISON RENEE BEAVER, CRNA, SHANNON L. FLOETER, CRNA, and EMILY KINSMAN, CRNA,

     Defendants.

UNPUBLISHED
November 19, 2024
12:27 PM

No. 363930
Genesee Circuit Court
LC No. 2020-114261-NH

JOHNATHAN MYERS,

     Plaintiff-Appellant,

v

No. 363972
Genesee Circuit Court

-1-

BOARD OF HOSPITAL MANAGERS FOR THE                     LC No.   2020-114261-NH
CITY OF FLINT, doing business as HURLEY
MEDICAL CENTER, and ERICH A. RIEHL, P.A.,

            Defendants-Appellees,

and

LASZLO HOESEL, M.D., METRO ACUTE
SURGICAL, PLC, ALLISON RENEE BEAVER,
CRNA, SHANNON L. FLOETER, CRNA, and
EMILY KINSMAN, CRNA,

            Defendants.

_____

JOHNATHAN MYERS,

            Plaintiff-Appellee,

v                                                      No.   365677
                                                       Genesee Circuit Court
BOARD OF HOSPITAL MANAGERS FOR THE                     LC No.   2020-114261-NH
CITY OF FLINT, doing business as HURLEY
MEDICAL CENTER, and ERICH A. RIEHL, P.A.,

            Defendants-Appellants,

and

LASZLO HOESEL, M.D.,

            Defendant-Appellee,

and

METRO ACUTE SURGICAL, PLC, ALLISON
RENEE BEAVER, CRNA, SHANNON L.
FLOETER, CRNA, and EMILY KINSMAN, CRNA,

            Defendants.

_____

Before:  MALDONADO, P.J., and M. J. KELLY and GARRETT, JJ.

PER CURIAM.

-2-

In Docket No. 363930,[1] defendants Laszlo Hoesel, M.D., and Metro Acute Surgical, PLC (Metro Acute) appeal by leave granted[2] the order denying their motion to strike plaintiff's general surgery standard of care expert, Allan S. Philp, M.D., pursuant to MCL 600.2169(1)(b); and the opinion and order denying their motion for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact) for lack of proximate causation. We affirm the trial court's ruling on proximate causation, vacate the court's ruling on the motion to strike Dr. Philp, and remand for additional proceedings.

In Docket No. 363972, plaintiff appeals by leave granted[3] the opinion and order granting partial summary disposition in favor of defendants Board of Hospital Managers for the City of Flint, doing business as Hurley Medical Center (Hurley), and Erich A. Riehl, P.A., pursuant to MCR 2.116(C)(10) on the issue of vicarious liability and the order granting Hurley and Riehl's motion for partial summary disposition pursuant to MCR 2.116(C)(10) for lack of proximate causation in relation to Riehl. We reverse.

In Docket No. 365677, defendants Hurley and Riehl appeal by leave granted[4] the order denying their motion for partial summary disposition pursuant to MCR 2.116(C)(10) on the issue of proximate causation relating to Hurley's nursing staff. We affirm.

## I. BACKGROUND

This case is a medical malpractice action relating to the amputation of plaintiff's right hand after a calcium solution extravasated, or leaked, from an IV and caused necrotic damage.[5] During the afternoon of April 25, 2019, an ambulance took plaintiff to Hurley after he suffered a gunshot wound to his upper abdomen. Dr. Hoesel was the emergency-room physician who treated plaintiff for his gunshot injury. When he arrived at the hospital, plaintiff became hypotensive and had to be resuscitated. He was then placed in a medically induced coma. That afternoon, Dr. Hoesel performed a procedure called a thoracotomy on plaintiff's abdomen. During the procedure, one of the nurses administered calcium chloride or calcium gluconate intravenously into plaintiff's right hand to stabilize his blood pressure. Later that evening, Dr. Hoesel performed a second surgery (a laparotomy), which included extensive repairs to plaintiff's liver, small intestines, and

---

[1] This Court consolidated the appeals in Docket Nos. 363930, 363972, and 365677. *Myers v Bd of Hosp Managers for the City of Flint*, unpublished order of the Court of Appeals, entered June 1, 2023 (Docket Nos. 363930, 363972, and 365677).

[2] *Myers v Bd of Hosp Managers for the City of Flint*, unpublished order of the Court of Appeals, entered June 1, 2023 (Docket Nos. 363930).

[3] *Myers v Bd of Hosp Managers for the City of Flint*, unpublished order of the Court of Appeals, entered June 1, 2023 (Docket No. 363972).

[4] *Myers v Bd of Hosp Managers for City of Flint*, unpublished order of the Court of Appeals, entered June 1, 2023 (Docket No. 365677).

[5] We note that defendants Allison Renee Beaver, Shannon L. Floeter, and Emily Kinsman were dismissed from this action in the trial court and are not relevant for purposes of this appeal.

colon, as well as the removal of plaintiff's right kidney. Calcium chloride or calcium gluconate might have been administered during this procedure as well.

After the second surgery, plaintiff suffered from recurrent bleeding. At around 11:00 p.m., plaintiff was taken to the Interventional Radiology (IR) Department for a third surgery (an embolization) to address massive blood loss coming from his lumbar artery. Hurley nurse Andrea Neeley injected 2 grams of either calcium chloride or calcium gluconate into plaintiff's right-hand IV before the procedure. Plaintiff's right hand was covered with a sterile drape throughout this procedure, according to charge nurse Wendy Foltz, checking the right hand during the IR procedure was not allowed because it would break the sterile field.

The surgery successfully stopped the bleeding and was over at approximately 1:14 a.m. The drapes were then removed, and Foltz, Neeley, and Riehl (a physician's assistant) discovered that plaintiff's hand was swollen and had turned purple. Plaintiff was then taken to the neurotrauma unit. According to Dr. Hoesel, Riehl contacted him at around 3:00 a.m. to discuss the issue with plaintiff's hand. After describing the condition of the hand, Riehl told Dr. Hoesel that Riehl planned to elevate the hand, put a warm compress on it, and call Poison Control. Riehl also told Hoesel that he placed an order for hyaluronidase, which is a chemical-reversal agent used for treatment following IC extravasations such as this. However, hyaluronidase is only effective if it is administered within three hours of the extravasations. Dr. Hoesel told Riehl that he was not comfortable administering the hyaluronidase because he believed it was outside of the three-hour window for the treatment.

Dr. Hoesel visited plaintiff at 7:30 a.m., which was at the end of his shift, and plaintiff's hand looked significantly worse. It was cold, tense, and discolored. Dr. Hoesel suspected that plaintiff was suffering from compartment syndrome, a condition involving dangerous pressure levels within muscles. At some point between 8:00 a.m. and 9:00 a.m., the daytime surgeon on staff performed a bedside fasciotomy procedure to relieve the pressure in plaintiff's hand. Later that day, at about 11:00 a.m., Dr. Jamal Farhan, a hand surgeon, evaluated plaintiff and observed a "deep chemical burn" involving most of the top of plaintiff's hand. Several days later, on May 2, 2019, a debridement procedure was performed to remove the damaged tissue from plaintiff's right hand. On May 13, plaintiff's thumb, index finger, and pinky finger were partially amputated. On May 21, plaintiff's first two fingers were amputated. Finally, what remained of plaintiff's right hand was amputated on May 24. Plaintiff was not discharged from Hurley until mid-September 2019.

Plaintiff sued defendants for medical malpractice. His claims included vicarious-liability claims against Hurley for the actions of Riehl, Dr. Hoesel, and the nursing staff. As discussed in more detail later, the parties conducted extensive fact and expert discovery, which included deposing plaintiff's standard of care experts as well as plaintiff's causation expert. Following discovery, Dr. Hoesel and Metro Acute (Dr. Hoesel's medical practice) moved for summary disposition, arguing that there was no evidence to support that Dr. Hoesel's conduct proximately caused plaintiff's injury. Hurley and Riehl also moved for summary disposition under MCR 2.116(C)(10). Hurley and Riehl argued that plaintiff could not establish proximate causation in relation to the nursing staff or Riehl because Dr. Philp, plaintiff's standard of care expert, testified that he was not critical of the conduct of any of these defendants, and did not maintain that they caused plaintiff's injury. As for Dr. Hoesel, they argued that plaintiff could not establish proximate

causation for the vicarious-liability claims relating to Dr. Hoesel because Dr. Philp testified that he could not say when the damage to plaintiff's hand became irreversible. Hurley and Riehl also moved for partial summary disposition of plaintiff's vicarious-liability claim against Hurley for the actions of Dr. Hoesel, arguing that Dr. Hoesel was not a Hurley employee or agent.

Later, the trial court issued a series of opinions and orders on the motions for summary disposition. First, the court granted Hurley and Riehl's motion for summary disposition relating to Riehl because of a lack of proximate causation. The court later clarified that it was not dismissing the action against the nurse defendants because a question of fact existed on whether the nursing staff was properly monitoring plaintiff's right hand. Second, the trial court denied Dr. Hoesel and Metro Acute's motion for summary disposition for lack of proximate causation, reasoning that Riehl wanted to administer hyaluronidase, but "the record clearly reflects [Dr. Hoesel] countermanded the administration of the ameliorative substance as being unnecessary because the time window for effectiveness had closed." The court further reasoned that the record suggested there was not "much of a sense of urgency" in how Dr. Hoesel handled plaintiff's hand condition. Third, the court entered an opinion and order granting Hurley's motion for partial summary disposition on the issue of ostensible agency. The trial court reasoned that plaintiff could not establish that he had a reasonable belief that Dr. Hoesel was the ostensible agent of Hurley because plaintiff was unconscious when Dr. Hoesel treated him.

Additionally, Dr. Hoesel and Metro Acute moved to strike Dr. Philp as plaintiff's standard of care expert pursuant to MCL 600.2169(1)(b). Dr. Hoesel and Metro Acute argued that Dr. Philp did not possess the necessary qualifications by spending most of his time in the active clinical practice of the most relevant subspecialties of trauma surgery and critical care surgery. Plaintiff responded, in relevant part, that Dr. Philp was qualified to testify because he had the same training and board certifications as Dr. Hoesel in general surgery, which was the one most relevant specialty. The court ultimately denied this motion.

These appeals followed, and the trial court stayed the proceedings below pending the outcomes in this Court.

## II. DOCKET NO. 363930

### A. STANDARD OF CARE EXPERT SPECIALTY

In Docket No. 363930, Dr. Hoesel and Metro Acute argue that the trial court abused its discretion when it ruled that Dr. Philp had a matching specialty in general surgery that qualified him to testify as plaintiff's standard of care expert under MCL 600.2169(1)(b). We agree with the trial court's conclusion that the specialty, rather than the subspecialty, was the controlling factor for purposes of MCL 600.2169(1)(b). However, we vacate the trial court's opinion and remand for the trial court to assess further Dr. Philp's qualifications under MCL 600.2169(2).

We review the trial court's rulings on the qualifications of a proposed expert witness for an abuse of discretion. *Stokes v Swofford*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket Nos. 162302 and 162302); slip op at 11. "An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Id*.

In a medical malpractice case, the plaintiff must provide expert testimony to support the plaintiff's definition of the standard of care and to establish a breach of the standard of care. *Id.* at ___; slip op at 3. MCL 600.2169, which governs the requirements for an expert witness in a medical malpractice case provides, in relevant part:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.
>
> * * *
>
> (2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:
>
> (a) The educational and professional training of the expert witness.
>
> (b) The area of specialization of the expert witness.
>
> (c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.
>
> (d) The relevancy of the expert witness's testimony. [MCL 600.2169(1)-(2).]

In *Stokes*, ___ Mich at ___; slip op at 2, the Michigan Supreme Court held that the specialty-matching requirement in MCL 600.2169(1)(b) related to "specialties," but not "*sub*specialties." *Id*. The Court explained that the plain language of MCL 600.2169(1)(b) did not consider or mention subspecialties. *Id*. at ___; slip op at 12-17. Nevertheless, the Court explained that the trial court "must ensure" that the expert meets the criteria outlined in MCL 600.2169(2), which includes the education and professional training of the expert, the expert's specialization, the length of time the expert is engaged in the active clinical practice or instruction of the health profession or specialty, and the relevance of the expert's testimony. *Id*. at ___; slip op at 19-20. Additionally, the trial court has broad discretion pursuant to MCL 600.2169(3) to strike experts on other grounds. *Id*. at ___; slip op at 2, 20.

There is no dispute that Dr. Hoesel and Dr. Philp practiced the same specialty (general surgery). Dr. Hoesel is board-certified in general surgery and specializes in general surgery. Likewise, Dr. Philp is board-certified in general surgery and specializes in "[g]eneral surgery, trauma surgery and critical care." Therefore, the only dispute is whether the two doctors have matching subspecialties. As the Michigan Supreme Court recently held in *Stokes*, whether Dr. Philp's subspecialty and Dr. Hoesel's subspecialty were matching is irrelevant to the issue whether Dr. Philp had a matching specialty pursuant to MCL 600.2169(1)(b). Therefore, the trial court reached the right result on the issue of whether Dr. Philp met the criteria of MCL 600.2169(1)(b), and it properly concluded that Dr. Philp has the same specialty as Dr. Hoesel for the purposes of offering standard-of-care testimony.

Nevertheless, the trial court's analysis was incomplete. MCL 600.2169(2) requires, at minimum, that the court evaluate several enumerated factors. The Michigan Supreme Court explained in *Stokes* that even when the experts have matching specialties under MCL 600.21169(1)(b), the trial court "must ensure" that the experts meet the criteria set out in MCL 600.2169(2). *Stokes*, ___ Mich at ___; slip op at 2. As the Court explained, MCL 600.2169(2) "*mandates* that the trial court evaluate *all the . . .* factors" in MCL 600.2169(2). *Id*. at ___; slip op at 19. Furthermore, MCL 600.2169(3), gives the trial court broad discretion to assess the expert and exclude experts on other grounds. *Id*. at ___; slip op at 20. The Supreme Court explained that MCL 600.2169(2) and (3) address the concern that an expert with a matching specialty may, in reality, practice a different area of medicine. *Id*. at ___; slip op at 19. MCL 600.2169(2) allows the trial court to take those differences into consideration when ruling on the expert's qualification. *Id*. at ___; slip op at 19. Because the court did not evaluate these factors, we vacate the trial court's ruling on the motion to strike Dr. Philp as plaintiff's standard of care expert and remand for further consideration of the motion under MCR 600.2169(2) and *Stokes*.[6]

---

[6] We note that our holding concerns only Dr. Philp's qualifications as a standard of care expert and does not impact Dr. Philp's expert testimony on proximate causation, which was not the subject of Dr. Hoesel and Metro Acute's motion to strike.

## B. PROXIMATE CAUSATION

Dr. Hoesel and Metro Acute argue that the trial court erred by denying their motion for summary disposition on the issue of proximate causation because plaintiff's expert testimony on this issue was speculative. We disagree.

We review de novo the trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). An MCR 2.116(C)(10) motion for summary disposition tests the factual sufficiency of the plaintiff's claim. *Id*. at 160. Summary disposition is proper when, after considering all evidence in the light most favorable to the party opposing the motion, the court determines there is no genuine issue of material fact. *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

To prevail in an action for medical malpractice, the plaintiff must establish

> (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

Regarding proximate causation, MCL 600.2912a(2) provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.[7]

A plaintiff must establish proximate causation by a preponderance of the evidence. *Craig*, 471 Mich at 67. Proximate causation includes both causation in fact and legal causation. *Id*. "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id*. at 86-87 (quotation marks and citation omitted). The court must resolve the issue of factual causation before addressing legal causation. *Id*. at 87. Proximate causation in a malpractice claim functions in the same way as in an ordinary negligence claim, and there can be more than one proximate cause of an injury. *O'Neal v St John*

---

[7] Plaintiff does not contend on appeal that his claim is one for the loss of an opportunity to achieve a better result.

*Hosp & Med Ctr*, 487 Mich 485, 496-497; 791 NW2d 853 (2010) (opinion by HATHAWAY, J.). Expert testimony is generally required to establish causation in medical malpractice cases. *Teal v Prasad*, 283 Mich App 384, 394; 772 NW2d 57 (2009). The expert's causation opinion must be based on facts in evidence. *Id*. at 395. Finally, the plaintiff may establish causation through reasonable inferences, but the plaintiff cannot rely on mere speculation and conjecture. *Skinner v Square D Co*, 445 Mich 153, 164-165; 516 NW2d 475 (1994).

In this case, plaintiff asserted in his second amended complaint that Dr. Hoesel's breaches of the standard of care caused plaintiff's right hand's condition to worsen and eventually led to the amputation of the hand. These alleged breaches included his failure to administer hyaluronidase, his failure to timely evaluate and appreciate the urgency of the issue with plaintiff's right hand, and his failure to order an immediate consultation with a hand surgeon. Dr. Hoesel and Metro Acute argue that plaintiff's causation theory was based on mere speculation. They note that Dr. Philp could not pinpoint when the irreversible damage occurred.

While Dr. Philp is plaintiff's standard of care expert, he provided an opinion that if Dr. Hoesel had not deviated from the standard of care, then it is more likely than not that the amputation of plaintiff's right hand could have been avoided. When asked about the time frame for the damage, Dr. Philp testified, in relevant part, as follows:

> *Q*. How much before did the irreversible damage occur?
>
> *A*. It's not possible to say. It's unlikely that it was tens of minutes. It's probably more likely hours. All of those things are a little different and the question is whether it's necrosis induced by calcium chloride, which could be as little as an hour to as many as a few hours, or whether it's a combination of that and a compartment syndrome, which is a pressure effect and would take a bit of time to develop, and similarly, it would take, you know, some amount of time before the tissue became nonviable. It's sort of a descending scale where it goes from healthy to not so healthy to not healthy at all to necrotic.

Dr. Philp also acknowledged that he could not say exactly when the extravasation occurred.

However, Dr. Hoesel and Metro Acute overlook the fact that Dr. Philp's causation opinion did not depend on when the extravasation injury occurred. Rather, Dr. Philp criticized Dr. Hoesel for not acting sooner to prevent *further* damage to plaintiff's right hand after he learned about the extravasation. Dr. Philp's main criticism of Dr. Hoesel was not considering a debridement or fasciotomy immediately upon learning about the condition of the hand. Dr. Philp opined that if Dr. Hoesel had not deviated from the standard of practice, then some of plaintiff's right hand function could have been saved. For this reason, the exact time the extravasation occurred was not relevant to Dr. Philp's causation analysis.

Dr. Hoesel and Metro Acute also emphasize that Dr. Philp agreed with defense counsel's characterization that attempting hyaluronidase treatment would have been a "hail Mary," but the hyaluronidase treatment cannot be considered in a vacuum. Dr. Philp testified he would have attempted the hyaluronidase *and* would have consulted a hand surgeon to perform a fasciotomy or debridement. He explained that even if the hyaluronidase had a limited effect, he would have

attempted to use it because there was little downside to doing so. He testified that if Dr. Hoesel had taken both steps (the hyaluronidase and the fasciotomy) by 4:00 a.m., then there was a 51% chance that plaintiff's hand could have been saved from amputation. This testimony was based on more than mere speculation and conjecture, and it considered the fact that plaintiff already had some level of damage to his right hand when Dr. Hoesel learned about the problem.

Similarly, Dr. Mustapha's opinion was not based on the precise timeframe of when the extravasation occurred. He opined in his affidavit that "timely recognition and treatment of the right-hand extravasation would have led to the salvage of the extremity." Dr. Mustapha explained during his deposition that the decision against conducting an aggressive debridement and a fasciotomy once the tissue became necrotic contributed to further tissue loss. During his deposition, Dr. Mustapha recognized that plaintiff was going to lose some function in his hand once the extravasation occurred regardless of how timely defendants had acted. However, he opined, with 51% certainty, that performing a fasciotomy and debridement three hours earlier (i.e., once Dr. Hoesel learned of the injury) would have, more likely than not, saved plaintiff's hand. The fact that Dr. Mustapha could not pinpoint exactly when the extravasation occurred was irrelevant to his opinion, which involved whether the amputation and further tissue loss in plaintiff's hand could have been avoided. We conclude this testimony established a genuine issue of material fact on whether, more probably than not, plaintiff suffered an injury that was proximately caused by Dr. Hoesel's negligence. See MCL 600.2912a(2).

Finally, Dr. Hoesel and Metro Acute argue that plaintiff impermissibly used Dr. Philp's and Dr. Mustapha's affidavits to contradict their deposition testimonies. A party or witness cannot create a question of fact by using an affidavit to contradict their deposition testimony. *Bakeman v Citizens Ins Co of the Midwest*, 344 Mich App 66, 76-77; 998 NW2d 743 (2022). However, a party may provide an affidavit to explain, expand on, or clarify their deposition testimony. *Id.* at 77. In this case, Dr. Philp and Dr. Mustapha prepared their affidavits *before* they were deposed, so they could not have been prepared to contradict their depositions. Further, we do not observe any contradictions between the deposition testimony and the affidavits. While the affidavits outlined a firmer position on causation, both experts testified during their deposition, with 51% certainty, that timely action would have saved plaintiff's hand from amputation. Dr. Hoesel and Metro Acute do not highlight in their brief on appeal any specific conflicts between the deposition testimony and the affidavits.

In sum, the trial court did not err by concluding that a question of fact existed on proximate causation and by denying Dr. Hoesel and Metro Acute's motion for summary disposition.

III. DOCKET NO. 363972

A. AGENCY

Plaintiff argues that the trial court erred by ruling that plaintiff could not establish that Dr. Hoesel was an ostensible agent of Hurley. We agree.

In general, a hospital is not vicariously liable for the negligence of an independent contractor physician who happens to use the hospital's facilities to treat their patients. *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 250; 273 NW2d 429 (1978). The key issue is whether the

patient looked to the hospital to provide medical treatment or "merely viewed the hospital as the situs where his physician would treat him for his problems." *Id*. at 250-251. As the Supreme Court explained in *Grewe*, "An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Id*. at 252 (quotation marks and citation omitted). Three elements must be established to prove ostensible agency:

> (First) The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; (second) such belief must be generated by some act or neglect of the principal sought to be charged; (third) and the third person relying on the agent's apparent authority must not be guilty of negligence. [*Id*. at 253 (quotation marks and citations omitted).]

In *Grewe*, the plaintiff was an emergency-room patient and had no preexisting relationship with the physician who treated him at the hospital. *Id*. at 246. The physician who treated the plaintiff and was alleged to have committed malpractice had staff privileges at the hospital. *Id*. After outlining the ostensible agency law in Michigan, the Michigan Supreme Court concluded that no evidence existed that would have put the plaintiff on notice that the doctor who committed the alleged malpractice was an independent contractor. *Id*. at 253.

In a recent order, the Supreme Court elaborated on the elements of ostensible agency. *Markel v William Beaumont Hosp*, 510 Mich 1071 (2022). In *Markel v William Beaumont Hosp*, unpublished per curiam opinion of the Court of Appeals, issued April 22, 2021 (Docket No. 350655), rev'd 510 Mich 1071 (2022), this Court held that the plaintiff could not establish ostensible agency because the plaintiff did not recall seeing the physician alleged to have committed the malpractice in the hospital, so her belief that the physician was an ostensible agent of the hospital was not reasonable. *Id*. at 6-7. When reviewing this Court's judgment, the Michigan Supreme Court explained that "the 'act or neglect' of the hospital is operating an emergency room staffed with doctors with whom the patient, presenting themselves for treatment, has no prior relationship." *Markel*, 510 Mich at 1071-1072. Critical to the Court's analysis in *Grew* was its conclusion that " an agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." *Id*. at 1072 (quotation marks, citation, alteration, and emphasis omitted). The Court clarified that the plaintiff does not need to show an additional, affirmative act by the hospital in a case involving an emergency room to establish ostensible agency. *Id*. The Court held that a hospital is not vicariously liable simply because a person receives medical treatment while in the hospital setting. *Id*. Rather, the key is the preexisting relationship between the patient and the doctor. *Id*. When the plaintiff has a preexisting relationship with the physician outside of the hospital, the plaintiff cannot reasonably assume that the physician is a hospital employee merely because the physician provides treatment in the hospital. *Id*. The Court reiterated that "when a patient presents at the emergency room for treatment, the patient's belief that a doctor is the hospital's agent is reasonable unless dispelled in some manner by the hospital or the treating physician." *Id*. The Court further rejected the idea that the plaintiff could not form a reasonable belief that the physician was a hospital agent simply because the plaintiff could not recall the doctor. *Id*. The Court reiterated "that patient testimony is not required to establish ostensible agency under *Grewe*." *Id*. Rather, absent a preexisting relationship with the treating physician,

the onerous is on the hospital or treating physician to affirmatively dispel any misconceptions about whether the physician is an agent of the hospital. *Id.*

Regarding the first element of ostensible agency (the reasonable belief in the agent's authority), plaintiff went to Hurley's emergency room and had no preexisting relationship with the doctors who treated him. The record contains facts that would support a reasonable belief that Dr. Hoesel was a Hurley agent. For example, Dr. Hoesel wore a Hurley badge, and Hurley provided him with the operating staff and a call room. There is no dispute that Dr. Hoesel and plaintiff did not have a prior doctor-patient relationship, which our Supreme Court recently clarified is a crucial issue for purposes of ostensible agency. See *id.* While plaintiff could not testify about his beliefs in relation to Dr. Hoesel because he was unconscious, the Michigan Supreme Court confirmed that patient testimony is not required to establish ostensible agency. See *id.* Regarding the second element of ostensible agency (whether Hurley took steps to dispel the reasonable belief), there is no evidence that, once plaintiff became conscious, Hurley informed him or any of his family members that Dr. Hoesel was not a Hurley agent. Nor is there evidence that Hurley informed the public at large that its physicians were not employees or agents of the hospital. Finally, on the final element of ostensible agency, there is no evidence that plaintiff was negligent. Therefore, plaintiff could, at the very least, establish a factual dispute on the elements of ostensible agency.

In sum, the trial court erred by granting Hurley and Riehl's motion for summary disposition on the issue of ostensible agency.

### B. PROXIMATE CAUSATION REGARDING RIEHL

Plaintiff argues the trial court erred by granting summary disposition of the claims relating to Riehl because there was a genuine issue of material fact regarding proximate causation. We agree.

The parties' arguments on appeal center on whether Dr. Hoesel's conduct superseded any negligence on the part of Riehl. A superseding cause is an intervening cause that breaks the chain of causation between the defendant's negligent act and the plaintiff's injury. *Auto-Owners Ins Co v Seils*, 310 Mich App 132, 157; 871 NW2d 530 (2015). An intervening cause is a cause that "actively operates in producing harm to another after the actor's negligent act or omission has been committed." *Id.* at 157-158 (quotation marks and citation omitted). An intervening cause will be considered a superseding cause that breaks the chain of causation unless the intervening conduct was reasonably foreseeable. *Id.* at 158.

Factual disputes existed regarding whether Riehl's conduct, more probably than not, was a proximate cause of plaintiff's injuries because Riehl did not act sooner to alert Dr. Hoesel or a hand surgeon about the worsening condition of plaintiff's right hand. To start, Foltz, Neeley, and Riehl all testified that they discovered that plaintiff's hand was swollen and had turned purple at around 1:15 a.m., on April 26, 2019. However, Riehl did not note the problem in plaintiff's medical chart until approximately 3:00 a.m. Riehl testified that he then called Poison Control, which recommended elevation and moist heat. Riehl contacted Dr. Hoesel at some point, but it is not clear exactly how long he waited to do so after contacting Poison Control. Dr. Hoesel and Riehl dispute whether Dr. Hoesel evaluated plaintiff himself, and such a dispute should be resolved

-12-

by a jury. Riehl also did not recall whether plaintiff's hand was elevated or whether moist heat was applied. Riehl wrote in the medical chart, "Will have Hand Surgery assess right hand."

In sum, the following facts support plaintiff's proximate-causation theory against Riehl: (1) Riehl waited nearly two hours to note the hand injury in plaintiff's chart and contact Dr. Hoesel; (2) Riehl did not contact Dr. Hoesel between 4:00 a.m. and 7:30 a.m., despite noting plaintiff's deteriorating hand condition; and (3) Riehl waited until the end of his shift to consult with a hand surgeon, despite the worsening condition of plaintiff's hand. As discussed earlier, while none of plaintiff's experts provided a causation opinion that was specific to Riehl, Dr. Mustapha opined, with 51% certainty, that performing a fasciotomy and debridement three hours earlier would have saved plaintiff's hand. This evidence supports plaintiff's theory that Riehl caused his hand injury to worsen by failing to properly monitor, treat, and notify timely the appropriate medical personnel about the condition of plaintiff's hand.

A factual dispute also exists regarding whether Dr. Hoesel's conduct superseded Riehl's conduct. First, the record does not support a conclusion as a matter of law that Dr. Hoesel was necessarily negligent. Further, as plaintiff notes in his brief on appeal, a factual dispute exists about whether Dr. Hoesel examined the hand himself. However, there is no support in the record for the assertion that Dr. Hoesel forbade Riehl from taking further action in relation to plaintiff's hand, such as consulting the hand surgeon or informing Dr. Hoesel that the hand was getting worse. At most, Dr. Hoesel testified that he told Riehl not to administer hyaluronidase. However, Dr. Hoesel instructed Riehl to continue elevating the hand and to "keep watching the hand." Dr. Hoesel explained that he expected the nursing staff to watch the hand on an hourly basis. Therefore, Riehl still had the authority to either inform Dr. Hoesel if plaintiff's hand became worse or consult a hand surgeon, which he did not do until the end of his shift. Therefore, the jury could conclude that any negligence on the part of Dr. Hoesel contributed to plaintiff's injury but did not break the causal chain between any negligence on the part of Riehl.

## IV. DOCKET NO. 365677

In Docket No. 365677, Hurley and Riehl argue that the trial court erred by denying summary disposition in their favor in relation to plaintiff's claims against the nursing staff because the court overlooked the fact that there was no expert testimony supporting but-for causation. We disagree.[8]

Examining the evidence in the light most favorable to plaintiff, we conclude a question of fact exists regarding whether the nursing staff's conduct was a proximate cause of plaintiff's injuries. After first noticing the issue with the hand at about 1:15 a.m., Riehl called Dr. Hoesel about the hand at around 3:00 a.m. Dr. Hoesel testified that he visited plaintiff at around 4:00 a.m. and that he expected that the nursing staff and Riehl would be monitoring the hand on a continuous basis. Neither Neeley nor Foltz could provide many details about how they treated plaintiff's right

---

[8] We note at the outset that the issue on appeal centers on the conduct of the nursing staff after the calcium substance extravasated into plaintiff's right hand. The parties do not raise an argument on appeal about the cause of the extravasation.

-13-

hand following the IR procedure. Neeley testified she was taking plaintiff's vital signs all night but could not recall whether that included testing the pulses in plaintiff's right hand. She could not say whether plaintiff's hand was getting worse while he was receiving treatment following the IR procedure. For her part, Foltz did not recall Dr. Hoesel coming to see plaintiff or receiving any treatment orders from Riehl. When asked how she addressed the situation with plaintiff's right hand, Neeley responded that she informed Riehl of the situation, he contacted Poison Control, and he contacted Dr. Hoesel. Neeley did not indicate she took any additional steps. Foltz did not recall asking Riehl any questions about how to address the hand. There was no evidence that Foltz or Neeley communicated with Riehl, Dr. Hoesel, or anyone else about plaintiff's hand after Riehl consulted Dr. Hoesel. By 5:02 a.m., Neeley noted that the hand was swollen, bruised, and weeping at the site of the IV. Around 5:12 a.m., Neely performed a right upper extremity assessment and noted swelling in the right hand, but that the hand was the appropriate color. Plaintiff's nursing expert, Natalie Darby, testified that Foltz and Neeley should have checked for pulses in plaintiff's hands every 15 minutes, monitored for capillary refill, and ensured that moist heat was applied. They also should have reported any change in plaintiff's status to Dr. Hoesel and Riehl. However, Dr. Hoesel was not called again to check on the hand, despite the ongoing swelling.

Regarding the expert testimony, Hurley and Riehl correctly note that Dr. Philp and Dr. Mustapha were not standard of care experts for nurses and did not opine that the nursing staff breached the standard of care. However, Dr. Philp testified that performing a bedside fasciotomy sooner would have released the pressure in the hand. Dr. Mustapha opined in his affidavit that "[t]he delay in treatment allowed [plaintiff's] right hand extravasation injuries to worsen and cause continued tissue damage which led to necrosis, extensive debridements and eventual amputation of his right hand." He opined that "timely recognition and treatment of the right-hand extravasation would have led to the salvage of the extremity." During his deposition, Dr. Mustapha clarified that the issue with plaintiff's hand should have been addressed in a "timely fashion." He recognized that the hand was in a fair condition by 5:00 a.m., and that it was unclear exactly how the situation with plaintiff's hand evolved between 5:00 a.m. and 7:30 a.m., which he believed was the key time frame for plaintiff's hand. As Dr. Mustapha put it, "[S]omewhere between 5 and 8:00, something was evolving." He explained that performing the fasciotomy as late as 8:00 a.m., instead of 9:00 a.m., would have changed the outcome for plaintiff's hand. He explained that "every hour, it could be a critical hour." Dr. Mustapha further noted, with 51% certainty, that performing a fasciotomy and debridement three hours earlier would have saved plaintiff's hand. This testimony supported plaintiff's causation theory that if the nursing staff had monitored the hand more closely and informed Riehl or Dr. Hoesel of the changes to plaintiff's hand earlier, then plaintiff's hand could have been saved.

Finally, we are not persuaded by Hurley and Riehl's argument that plaintiff cannot establish causation in relation to the conduct of the nurses between 5:00 a.m. and 7:00 a.m., because Dr. Philp testified that Dr. Hoesel should have performed a fasciotomy at 4:00 a.m. Regardless of whether Dr. Hoesel should have performed a bedside fasciotomy at 4:00 a.m., the relevant question is whether the nursing staff's actions and inactions up to 7:30 a.m. contributed to the loss of plaintiff's hand. When viewing the evidence in the light most favorable to plaintiff, plaintiff presented more than mere speculation and conjecture on this issue. Therefore, the trial court did not err by denying summary disposition on plaintiff's claim in relation to Hurley's nursing staff.

## V. CONCLUSION

In Docket No. 363930, we affirm the trial court's opinion and order on proximate causation but vacate the court's opinion and order on the motion to strike Dr. Philp. In Docket No. 363972, we reverse the opinion and order granting summary disposition on the issue of vicarious liability. We likewise reverse the opinion and order granting summary disposition in favor Hurley and Riehl on the issue of proximate causation in relation to Riehl. In Docket No. 365677, we affirm. This case is remanded to the trial court for additional proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Kristina Robinson Garrett